**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 13, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

THE ESTATE OF JAMES D. REDD, M.D., by and through Jeanne H. Redd, the personal representative for and on behalf of Plaintiffs Decedent James D. Redd, and his heirs as an individual in a survivorship action and in a wrongful death action,

     Plaintiff - Appellant,

v.

DANIEL LOVE, Bureau of Land Management Special Agent, in his individual capacity,

     Defendant - Appellee,

LAUREN GOOD, Special Agent Bureau of Land Management, in her individual capacity; DAVID KICE, BLM Special Agent, in his individual capacity; DAN BARNES, Bureau of Land Management Special Agent, in his individual capacity; JON EDWARDS, Special Agent Bureau of Land Management, in his individual capacity; SETH FOOTLIK, FBI Special Agent, in his individual capacity; BRENT RANGE, Special Agent Bureau of Land Management, in his official capacity; JENNIFER VANDERVEER, Special Agent Bureau of Land Management, in her individual capacity; SELMA SIERRA, Former BLM Agent Director, in her individual capacity; JUAN PALMA, BLM Utah Director, in his individual capacity; LYNDA VITI, FBI Special Agent, in her

No. 16-4010

individual capacity; NEIL ROGERS, FBI Special Agent, in his individual capacity; DIANE EDEN KISABETH, FBI Agent, in her individual capacity; GIBSON M. WILSON, FBI Special Agent, in his individual capacity; TIMOTHY FUHRMAN, FBI Special Agent In Charge, in his individual capacity; JAMES MCTIGHE, FBI Special Agent In Charge, in his individual capacity,

Defendants.

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:11-CV-00478-RJS)**

_____

Shandor S. Badaruddin, (Edward P. Moriarity, with counsel on the briefs), Moriarity & Badaruddin, Missoula, Montana, for Plaintiff-Appellant.

Laura K. Smith, Trial Attorney (Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Mark B. Stern and Sonia K. McNeil, Attorneys, with counsel on the brief), United States Department of Justice, Washington, D.C., for Defendant-Appellee.

_____

Before **BRISCOE**, **MURPHY**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

In June 2009, as part of a federal law-enforcement investigation known as "Operation Cerberus," FBI and Bureau of Land Management ("BLM") agents arrested twenty-three people and searched twelve properties in and near three Utah cities—Blanding, Monticello, and Moab. The operation targeted persons possessing and trafficking in Native American artifacts illegally taken from the Four Corners

2

region of the United States.[1] One day after agents searched Dr. James D. Redd's home, arrested him as part of this operation, and released him on bond, Dr. Redd committed suicide.

Dr. Redd's Estate ("the Estate") sued sixteen named FBI and BLM agents and twenty-one unnamed agents under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), claiming that the agents had violated Dr. Redd's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. The district court granted the Defendants' motions to dismiss all of the Estate's claims except one—a Fourth Amendment excessive-force claim against the lead BLM agent, Daniel Love. Later, on qualified-immunity grounds, the district court granted Agent Love summary judgment on that final claim. The Estate appeals the district court's dismissal of the excessive-force claim. We affirm.

## BACKGROUND

### I. Operation Cerberus

To deal with the problem of people illegally taking and trafficking Native American artifacts from federal lands, BLM agents and FBI agents jointly investigated these crimes occurring in southern Utah and the Four Corners region. As part of their investigation, the two agencies arranged controlled sales of illegally taken artifacts. Agent Love served as the lead BLM agent for the operation. After

---

[1] This region includes the southeastern corner of Utah, the southwestern corner of Colorado, the northeastern corner of Arizona, and the northwestern corner of New Mexico.

3

presenting a judicial officer an affidavit about these undercover transactions, the agents obtained many search and arrest warrants, including warrants to arrest Dr. and Mrs. Redd and to search their house.[2]

On June 10, 2009, twelve teams of BLM and FBI agents simultaneously executed search warrants at different locations in and near Blanding, Monticello, and Moab, Utah. Each team assigned to the scattered search locations comprised between eight and twenty-one federal agents and at least one cultural specialist. Upon completing their assigned searches, agents reported to other search locations to help as needed.

Team members were concerned for their safety because some local citizens had previously acted hostilely toward federal officials. Partly for that reason, each team had an operations plan identifying its target location and any expected obstacles. FBI and BLM policy required agents to wear soft body armor and to carry a firearm when executing warrants or when confronting potentially dangerous situations. For a high-risk search at one house, the FBI's Salt Lake City SWAT team furnished ten members to assist in executing that search warrant.

---

[2] Before the search, a grand jury indicted Dr. Redd on one count of "receiv[ing], conceal[ing], and retain[ing] property belonging to an Indian tribal organization, with a value of more than $1,000 . . . knowing such property to have been embezzled, stolen, or converted . . . in violation of 18 U.S.C. § 1163 and 2." R. vol. 1 at 201. The property referenced in the indictment was an "effigy bird pendant." *Id.* Mrs. Redd was indicted for several additional counts of receiving and selling tribal property.

Based on evidence seized during the searches, the agents arrested twenty-three people for allegedly possessing or trafficking stolen Native American artifacts. Sixteen of the arrestees, including Dr. and Mrs. Redd, resided in Blanding, Utah.

## II.     Search and Arrest Warrants for the Redds

The operations plan for the team assigned to search the Redds' house advised that three adults and one child lived there—Dr. and Mrs. Redd, their adult daughter Jericca Redd, and her minor son. The plan further advised that the Redds' house stood on elevated terrain, making its one-eighth-of-a-mile-long driveway visible from the house. Before arriving, the agents didn't know whether the Redds owned guns, or whether anything prevented entry onto the property or barricaded the house.

Upon arriving, the agents knocked on the front door. When Mrs. Redd answered, agents arrested her without incident and took her to the kitchen. Agents took Jericca Redd to the piano room upstairs.[3] Dr. Redd wasn't then at the house, but agents arrested him when he arrived home at 6:55 a.m. Dr. and Mrs. Redd waived their *Miranda* rights and spoke with the agents, at least intermittently, until no later than 10:34 a.m., when the agents drove the Redds to Monticello, Utah for booking.[4] Jericca Redd drove her parents back to their house after their initial court appearances in Moab, Utah. When the Redds arrived home at about 5:00 p.m., agents

---

[3] Jericca Redd's son had slept over at a friend's house the night before, so he wasn't home on the day of the search.

[4] Dr. Redd's questioning ended at 9:30 a.m., but Mrs. Redd's questioning continued past then.

were still searching the house, so the Redds waited outside for them to finish. By about 5:30 p.m., the agents had completed their search, and the Redds reentered their house. The next day, Dr. Redd committed suicide.

## III.    Number of Agents

The parties disagree about how many agents were on the Redds' property during the search and arrests. An official list of search locations and agents ("Search Warrant Locations List") shows that those directing the entire operation apportioned 130 agents among the twelve locations. Each search location had between eight and twenty-one agents. The Search Warrant Locations List shows that at least one "cultural specialist" was also assigned to each search location. R. vol. 7 at 784–85. A list of command agents and their locations ("Command Locations List") identifies twenty command agents unassigned to any particular location. These command agents moved between search warrant locations and command-post locations as needed.

The Search Warrant Locations List shows that those directing the operation assigned twelve agents to the Redds' house. Upon arriving at and departing from the Redds' house, all agents were required to sign a log identifying their arrival and departure times. This sign-in log reveals that twelve agents and one cultural specialist were present when Dr. Redd arrived home at 6:55 a.m. When Dr. Redd arrived, some of these agents were already inside the house with Mrs. Redd and Jericca Redd, so Dr. Redd initially encountered fewer than twelve agents. Two agents met Dr. Redd at the end of the driveway and escorted him to the garage, and two other agents joined

6

them in questioning Dr. Redd inside the garage. Beyond this, the record provides no help in determining how many agents Dr. Redd saw that morning.

The Estate agrees that the initial team comprised no more than twelve BLM and FBI agents and one cultural specialist. It also agrees that a team this size was lawful. But the Estate contends that over the course of the hours-long search of the Redds' house, as many as sixty-nine agents arrived there. In support, it relies on a simple but problematic mathematical calculation.

First, it contends that 150 agents participated in the searches, pointing to an FBI press release saying that "[t]he law enforcement operation was conducted on June 10, 2009 by approximately 150 agents and employees from the FBI and the BLM." R. vol. 17 at 1237. Second, it subtracts from this figure 91 agents—those identified by Agent Love as searching at locations other than the Redds' house. From this, the Estate argues that it is "reasonable to infer that one or more, and likely more, of the remaining sixty-nine agents (150 minus 91) were at the Redd Home."[5] Appellant's Opening Br. at 25. But Agent Love's list of agents searching the eleven locations besides the Redds' house in southern Utah that day totals 122 agents and employees[6] (not 91 as the Estate says). This means that at most, twenty-eight agents were not listed at a specific search location.

_____

[5] We gather that the Estate's subtraction should have resulted in fifty-nine and not sixty-nine.

[6] This does *not* include any of the command agents listed in the Command Locations List, but it does include "archeologists," whom the parties also refer to as

7

As additional support to show a large number of agents on the Redds' property, the Estate relies on the Declaration of Jericca Redd, who says she saw "as many as 50 agents at any one time," not specifying where or when she saw them, instead saying only that they had been "everywhere." R. vol. 17 at 1241, 1243. Perhaps to help confirm her estimate, Jericca Redd also recounts that she heard Agent Love call other agents on a telephone to come assist in searching the Redds' house. But she also says she left the house "sometime after 12:00 pm" to pick up her parents from their court appearance in Moab. *Id.* at 1244**.** So she was able to see agents who arrived at the Redds' house after her parents had left for booking in Monticello.[7]

Agent Love disputes the Estate's calculations. He testified that no more than twenty-two agents were at the Redds' house while Dr. Redd was there between 6:55 a.m. and 10:34 a.m.[8] He also testified that some agents came to the Redds' house after completing their assigned searches to help identify and catalog the unexpectedly

---

cultural specialists throughout the record. R. vol. 17 at 1041; R. vol. 7 at 773. Agent Love described the cultural specialists as employees of BLM. Seven cultural specialists ultimately assisted the search at the Redds' house. For simplicity, we don't distinguish between agents and employees in this opinion.

[7] After agents took Dr. and Mrs. Redd to Monticello, but before Jericca left to drive them back to Blanding, the log shows that sixteen additional agents arrived at the Redds' property.

[8] According to the district court, the Estate brought its excessive-force claim under the Fourteenth Amendment's unreasonable-seizure provision. Along this same line, the parties assert and agree that the relevant time period was "that time during which [Dr. Redd] was seized and at home to experience the alleged unconstitutional show of force . . . [which] was between the hours of 6:55 a.m. and 10:34 a.m., on June 10, 2009." Appellant's Opening Br. at 37.

high number of artifacts found at the Redds' house. To support his count, Agent Love relied on the sign-in log at the Redds' house.[9] Twenty-two agents signed the log before agents took Dr. Redd and Mrs. Redd to Monticello for booking. Among these twenty-two agents, Agent Love included nine agents who arrived sometime before the agents took Dr. and Mrs. Redd to Monticello, Utah, including four FBI SWAT-team members.

## IV.    Appearance of Agents

The Estate also presented evidence that some agents wore SWAT-like gear. By the Estate's account, the agents who first entered the home to arrest Mrs. Redd "were heavily armed" and "appeared to be wearing bullet proof vests or some sort of body armor or flak jacket." *Id.* at 1242. Jericca Redd says that the agents' "appearance was more like military than the police officers I am accustomed to seeing," and likened their attire to that of a SWAT-team member shown in a government exhibit. *Id.* According to Jericca Redd, the agents' guns "looked like machine guns," and were not "pistols or rifles." *Id.* She concedes that some agents entering the house were not as heavily armed. She also clarifies that the agents "all had guns, but they did not all have their guns out." *Id.* at 1243.

---

[9] The Estate argues that the sign-in log is inaccurate and urges us not to rely on it in determining the number of agents. To support this claim, it points out that one agent admittedly did not sign the log until three hours after arriving at the house. From this, the Estate argues that more agents also might have failed to sign the log. We agree with the district court that one agent's signing the log late doesn't render the entire sign-in log unreliable.

Agent Love testified that only four SWAT-team members assisted in the Redd search, and that they arrived after Dr. Redd was inside the garage.[10] He also said that, except for the four SWAT-team members and the cultural specialists, all the other agents wore soft body armor (also called bulletproof vests) and carried guns, as required under BLM and FBI policy. Viewing the evidence in the light most favorable to the Estate, we assume that the first set of agents wore soft body armor and carried firearms.

## V.  District Court Proceedings

After Dr. Redd's suicide, the Estate, as well as Dr. Redd's heirs and Mrs. Redd, filed this *Bivens* action, claiming wrongful-death damages.[11] As mentioned, the Estate's sole claim on appeal was that Agent Love used excessive force in violation of the Fourth Amendment by sending a large number of heavily armed federal agents to execute the Redds' warrants. Agent Love moved for summary judgment on qualified-immunity grounds.

---

[10] The SWAT-team members positioned themselves outside the house after agents overheard a caller leave a threatening voicemail message for them, but this didn't happen until after Dr. and Mrs. Redd had left the property.

[11] It simultaneously sued various governmental agencies and employees under the Federal Tort Claims Act. The district court granted summary judgment in favor of the United States in that case. *Estate of Redd v. United States*, 171 F. Supp. 3d 1229, 1240 (D. Utah 2016) ("Defendant's use of 12 heavily armed agents, dressed in body armor . . . was reasonable and did not amount to an unconstitutional showing of force."). The Estate's appeal is pending in this court.

After considering the evidence about the number of agents, including the sign-in log and Jericca Redd's Declaration, the district court found that a maximum of twenty-two agents—counting the initial twelve that Jericca Redd had described as clothed in SWAT-like gear—were present somewhere on the Redd's property before agents drove Dr. and Mrs. Redd away at 10:34 a.m.[12] Relying on *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), the district court granted Agent Love's summary-judgment motion on qualified-immunity grounds. Addressing the first prong of the qualified-immunity analysis, the district court concluded that "the . . . agents' mere presence at the home and proximity to Dr. Redd, without more, did not create an excessive show of force." *Estate of Redd v. Love*, No. 2:11-cv-00478-RJS, 2015 WL 8665348, at *12 (D. Utah Dec. 11, 2015). And addressing the second prong, the district court concluded that

> not every reasonable officer would have been on notice that it would be unlawful to deploy twelve SWAT-like agents and a cultural specialist to execute a warrant and then call nine additional agents to help search a home and catalog substantial physical evidence for a nonviolent offense at the home of a nonviolent person.

*Id.* at *14. The Estate appealed.

---

[12] The Estate offers us nothing to show that Dr. Redd would have seen all or even most of these agents. He would have seen only those agents in view when he came and left. At both times, some of the agents were searching the house or interviewing Mrs. Redd. Additionally, the district court described the agents as wearing SWAT-like gear only because Jericca Redd had described their attire as similar to that shown in Agent Love's exhibit showing a SWAT agent. But the agents actually wore soft body armor as required by agency policy.

## DISCUSSION

### I.　Standard of Review

We review de novo a grant of summary judgment that is based on qualified immunity. *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015). "[Q]ualified immunity . . . is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Once a defendant asserts qualified immunity, "the burden shifts to the plaintiff to establish (1) a violation of a constitutional right (2) that was clearly established" at the time of the violation. *Puller*, 781 F.3d at 1196 (citing *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc)). We may decide which of these two prongs to address first, and need not address both. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 n.2 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

To meet the "heavy two-part burden" necessary to overcome a qualified-immunity defense, plaintiffs must point to admissible evidence in the record. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). "We review the evidence in the light most favorable to the nonmoving party." *Puller*, 781 F.3d at 1196 (quoting *Cortez*, 478 F.3d at 1115). But we need not make unreasonable inferences that are unsupported by the record. *See Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1187 (10th Cir. 2013) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party."

12

(quoting *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008)))

(internal quotation marks omitted).

## II. Qualified Immunity

We address only the first prong of the qualified-immunity analysis, whether Agent Love violated Dr. Redd's constitutional rights. *See Thomson*, 584 F.3d at 1312 n.2. The Estate asserts that Agent Love violated Dr. Redd's Fourth Amendment rights by using excessive force in executing his arrest warrant.[13] We evaluate excessive-force claims using the Fourth Amendment's objective-reasonableness standard. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004). In this context, qualified immunity turns on "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Thomson*, 584 F.3d at 1313 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). In determining this, we must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Factors relevant to this inquiry include "the severity of the crime at issue, whether the suspect poses an

---

[13] In the third claim of its Complaint—the one now before us on appeal—the Estate alleges that Agent Love is responsible for having "violated Plaintiff James D. Redd's rights under the Fourth Amendment of the Constitution of the United States by violating Plaintiffs' right to be secure from excessive force." R. vol. 2 at 388. The district court concluded that the Estate brought this claim "under only the Fourth Amendment's prohibition on unreasonable seizures." *Redd*, 2015 WL 8665348, at *9. The Estate hasn't taken issue with the district court's view of the claim, so we only review its decision on excessive force during Dr. Redd's seizure.

13

immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.*

To satisfy its summary-judgment burden under the first prong of the qualified-immunity analysis, the Estate must produce evidence sufficient to show that Agent Love employed excessive force in violation of Dr. Redd's Fourth Amendment rights. *See Brosseau*, 543 U.S. at 197. The Estate bases its excessive-force claim on the number of agents at the Redds' house and their appearance. Specifically, it alleges that Agent Love used excessive force by deploying more than fifty agents wearing bullet-proof vests and carrying guns to execute the warrants. But the Estate offers no proof that Dr. Redd even saw fifty agents before being transported to Monticello, Utah. Moreover, it doesn't claim that the agents used excessive force by physically abusing Dr. Redd or pointing firearms at him.

## A.    Number of Agents

The parties dispute how many agents participated in the search at the Redds' house.[14] At about 6:55 a.m., immediately after Dr. Redd drove up his driveway, agents arrested him. Everyone agrees that twelve agents and a cultural specialist were then at the Redd property, and that some of these agents were inside the house with

---

[14] "[B]ecause Fourth Amendment rights are personal rights that cannot be asserted vicariously, the Estate may recover only for the injuries Dr. Redd suffered personally." *Redd*, 2015 WL 8665348, at *9 (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978); *Coleman-Johnson v. Chi., Ill. Police Officers*, No. 95 C 3455, 1996 WL 417568, at *4 (N.D. Ill. July 22, 1996)) (internal footnotes omitted). So only the agents that Dr. Redd saw or would likely have seen before he left for Monticello for booking are relevant to our analysis.

Mrs. Redd and Jericca Redd. Moreover, everyone agrees that after arresting Dr. Redd, agents took him to the garage. Except for a visit to the bathroom, located immediately inside the home from the garage, Dr. Redd remained inside the garage until 10:34 a.m., when agents took him to Monticello, Utah. When describing Dr. Redd's arrest and voluntary questioning, the record documents refer to just five agents: Agent Barnes, Agent Vanderveer and three "unidentified agent[s]." R. vol. 2 at 376–88.

Perhaps Dr. Redd saw additional agents when he was briefly outside his garage before being taken to Monticello, but the record doesn't give us a fair idea how many agents might have been in his sight. For help, we look to the sign-in log, which reveals that of the twenty-two agents who had been at the house between 6:55 a.m. and 10:34 a.m., only sixteen remained when Dr. Redd left his property. Because some agents were inside the Redds' house searching, not all sixteen remaining agents would have been in Dr. Redd's sight by the time he left the property.

In supporting its excessive-force claim, the Estate relies in part on *Graham* and *Holland*. First, it argues that all three *Graham* factors—specifically, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight"—weigh heavily in its favor. 490 U.S. at 396. So, the Estate argues, we shouldn't go any further than applying these factors, and should instead determine that Agent Love's conduct was objectively unreasonable based solely on these factors. But *Graham* itself noted that "[t]he test of reasonableness under the

15

Fourth Amendment is not capable of precise definition or mechanical application."

*Id.* (alteration in original) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). And it noted that the Fourth Amendment reasonableness analysis always depends on whether the totality of the circumstances justified the conduct at issue. *Id.* (quoting *Garner*, 471 U.S. at 8–9).

The Fourth Amendment reasonableness analysis is not limited to the three *Graham* factors. Here, an analysis based strictly on the *Graham* factors wouldn't reach all the circumstances relevant in considering the Estate's Fourth Amendment claim. *See Brosseau*, 543 U.S. at 197–99 (explaining that while *Garner*'s and *Graham*'s principles guide courts in determining whether there was a constitutional violation, excessive force claims must still be judged on an objective reasonableness standard). *Graham* involved just one defendant whom police arrested without a warrant in a public setting. 490 U.S. at 389. Because *Graham*'s circumstances differ so greatly from those in this case, its framework doesn't fit the constitutional question here.

Second, in supporting its excessive-force claim, the Estate also relies on *Holland*, 268 F.3d at 1183. There, we evaluated excessive-force claims arising from a sheriff's deploying seven SWAT-team deputies and three uniformed non-SWAT deputies to execute a search warrant and misdemeanor-arrest warrant. *Id.* We also evaluated the SWAT team's conduct while doing so. *Id.* During the nighttime search and arrest, the SWAT team wore green camouflage clothing without law-enforcement markings and hoods covering their faces except for their eyes. *Id.*

16

Upon arriving at the residence, the SWAT-team deputies approached three people playing basketball in front of the house, one just eight years old, pointed firearms at them, and ordered them to lie face down on the concrete. *Id.* at 1183–84. On their way to the house, they encountered a second minor and ordered him at gunpoint to lie on the ground. *Id.* at 1184. Still outside the home, a SWAT-team member encountered a four-year old girl, who ran into the house screaming after seeing the SWAT-team members. *Id.* As the young girl ran, a SWAT-team member trained his firearm's laser on the girl's back. *Id.* The SWAT-team members then entered the house and held several people inside at gunpoint. *Id.* The home's occupants also contended that the SWAT team had entered the home without knocking and announcing their presence. *Id.*

In evaluating whether the SWAT team's conduct amounted to excessive force, we observed that "[t]he decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens." *Id.* at 1190. But we ultimately concluded that "the force invoked by the *decision* to deploy" the SWAT team was not excessive under the Fourth Amendment. *Id.* at 1191 (emphasis in original). In those particular circumstances, which presented a possibility of violence from the suspect, we concluded that deploying heavily armed SWAT deputies in unmarked gear obscuring the deputies' faces was not objectively unreasonable. *See id.* In so holding, we noted that the deputies expected to—and indeed did—find several people besides the suspect at the suspect's residence, and

17

that they also found firearms there. *Id.* On this basis, we awarded the sheriff and deputies qualified immunity against the excessive-force claim based upon their SWAT gear.[15] *Id.* at 1192.

Agent Love had equally good—if not better—reason to deploy many agents to search the Redds' expansive home and provide for officer safety. Although not facing an allegedly violent misdemeanant as in *Holland*, the agents in Operation Cerberus had ample reason to believe that they were entering a hostile environment. The Estate acknowledges the historical tension between federal powers and some of Blanding's citizenry. And importantly, recent history shows instances of violence from some of the local citizenry against federal employees and agents working there.[16] We certainly can't say that the agents acted imprudently in "anticipat[ing] hostility from the suspects and members of the community." R. vol. 7 at 784.

Moreover, in particular, Agent Love had an objectively reasonable basis for safety concerns in arresting the Redds and searching their home. Though the agents expected to find only three adults and a child, the agents knew that the Redds also

---

[15] But we denied qualified immunity against the excessive-force claims arising from the conduct of the deputies allegedly pointing firearms at children and failing to knock and announce their presence, even though no one was injured. *Id*. at 1197. In the present appeal, the Estate raises no corresponding claims of mistreatment of Dr. Redd.

[16] Agent Love submitted several newspaper articles beginning in 2008 showing episodes involving hostility and violence directed at federal agents in southern Utah. In fact, one article mentions that a 1986 federal operation concerning archaeological items "strained relations with the federal government, which residents already regarded as arrogant and intrusive." R. vol. 18.3 at 1379. These news articles show that the agents had reason for safety concerns while executing the search warrants.

18

had two adult sons. And the agents had particular reason to believe that the Redds might be hostile to the federal government. In a highly publicized and locally controversial criminal case in 1995, federal agents arrested Dr. Redd and Mrs. Redd for desecrating a dead body while they were digging for Native American artifacts. Finally, Dr. Redd's status as a physician did not eliminate the federal agents' concerns that arresting him and his wife might provoke a response.

The reasonableness of these safety concerns was borne out when a man the agents believed was one of the Redds' sons called the Redds' house and left two threatening voicemails, prompting the four FBI SWAT-team members to take defensive positions to protect against possible violence. The first call came at 11:55 a.m. with the caller saying, "Is anybody there? I know somebody's there. A whole bunch of you. You gonna pick up the phone? All right. I'll be . . . there in a little bit. Be ready." R. vol. 13 at 914. The second call came at 1:13 p.m., and the caller said, "Hey, you guys still too scared to answer the phone? Don't touch anything of mine. Trust me. You don't want to." *Id.*

Further, beyond safety concerns, Agent Love had an objectively reasonable basis to deploy the numerous agents at the Redds' house. The search required locating, sorting, and cataloging more than 800 Native American artifacts—a job requiring many personnel. And allowing other agents to help at the Redds' house after completing their searches elsewhere was also objectively reasonable. Otherwise, it appears that agents could not have finished the search by day's end, leaving the Redds unable to return to their house that day. *Cf. Mountain Pure, LLC v. Roberts*,

19

814 F.3d 928, 931, 933 (8th Cir. 2016) (holding that it was reasonable for thirty-five law enforcement agents to search a 100,000-square-foot bottling facility).

Nor has the Estate offered any cases holding that law-enforcement officers acted with excessive force by virtue of the number of officers deployed to execute a search warrant and arrest warrant. But we have located several cases in which courts have found no excessive force despite similar numbers of officers being deployed.[17] We leave open the possibility that sending a large number of agents to execute a search warrant and arrest warrant for a nonviolent crime can amount to excessive force. But this isn't that case. Again, the Estate presents insufficient evidence about how many agents Dr. Redd even saw. And the Estate does not suggest on appeal that the agents—however many Dr. Redd saw—acted aggressively or threateningly toward him.[18] In view of the need to search an expansive home for sometimes tiny

---

[17] *See, e.g.*, *United States v. Rizzi*, 221 F. App'x 283, 286 (4th Cir. 2007) ("[T]he mere fact that twenty-four officers took part in the execution of the warrant did not render its execution unreasonable under the Fourth Amendment."); *United States v. Sanders*, 104 F. App'x 916, 922 (4th Cir. 2004) (concluding that expansive scope of search reasonably justified sending forty law enforcement officers dressed in bullet-proof vests and carrying sidearms to execute a search warrant for financial documents in an office building); *Crosby v. Paulk*, 187 F.3d 1339, 1343, 1348 (11th Cir. 1999) (concluding that it was reasonable for more than forty law enforcement officers to assist in executing an administrative search of a nightclub and to conduct identification checks for 400 club patrons); *United States v. Simon*, No. 3:10–CR–56 RM, 2010 WL 4236833, at *12 (N.D. Ind. Oct. 20, 2010) (concluding that it was reasonable for eleven armed agents wearing body armor and flak jackets to search a 4,000-square-foot house for evidence of tax fraud from the morning until 5:00 p.m.).

[18] The district court dismissed the Estate's claims that agents acted with excessive force by using harsh language to humiliate Dr. Redd, falsely accusing him

objects, as well as a legitimate concern for officer safety, the totality of the circumstances justified the number of agents executing the search and arrest warrants at the Redds' house.

### B.     Appearance of Agents

The Estate contends that Agent Love also acted with excessive force in deploying the agents in SWAT-like gear. But this decision rested outside Agent Love's authority—BLM and FBI policy required the agents to wear soft body armor and carry guns. The BLM manual requires that "[w]hen in uniform, all [law enforcement officers] will wear the primary firearm, and handcuffs at all times" and that "[law enforcement officers] who are engaged in duties that may expose them to high risk enforcement incidents such as search warrants, arrest warrants or felony vehicle stops, must wear soft body armor." R. vol. 8 at 797, 807. Similarly, FBI policy requires that agents "must be armed at all times when on official duty" and that "[i]mmediate access to the handgun and security are paramount."[19] R. vol. 10 at 830. Further, the policy declares that "[w]earing of body armor . . . is mandatory during planned arrests, execution of search warrants and surveillances which can reasonably be expected to culminate in a confrontation with armed and dangerous

of crimes, and refusing to let him use the restroom with dignity. The Estate did not appeal this dismissal.

[19] Nor is the policy afoul of our cases governing excessive force. Because "the right to arrest an individual carries with it the right to use some physical coercion to effect the arrest," it isn't always unreasonable for officers to use their weapons to control a situation. *Holland*, 268 F.3d at 1192 (citing *Thompson v. City of Lawrence, Kansas*, 58 F.3d 1511, 1516 (10th Cir. 1995)).

21

subject(s)." *Id.* at 833. So if the FBI and BLM agents' outer wear appeared intimidating, it was due to these policies and not to Agent Love's actions.

Thus, even interpreting the facts most favorably to the Estate, we see no constitutional violation. Agent Love's conduct—deploying twenty-two agents wearing soft body armor and carrying firearms in compliance with agency policy— was not objectively unreasonable under the circumstances. With this in mind, we of course also agree with the district court's conclusion that the Fourth Amendment right at issue in this case wasn't clearly established. Thus, we conclude that Agent Love was entitled to qualified immunity.

## CONCLUSION

Because the district court correctly granted qualified immunity to Agent Love, we AFFIRM the district court's grant of summary judgment awarding Agent Love qualified immunity.