FILED
United States Court of Appeals
Tenth Circuit

March 17, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

———————————————————————

ANGEL SALCIDO, personal
representative of the wrongful death estate
of Cristal Cervantes; WANDA
MARTINEZ,

     Plaintiffs - Appellants,

v.

CITY OF LAS VEGAS; CHIEF ADRIAN
CRESPIN; SGT. MARK LUCERO; LT.
HUGO MUNOZ; NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY;
NEW MEXICO STATE POLICE; SGT.
ELIAS RAEL; SAN MIGUEL COUNTY;
SAN MIGUEL COUNTY SHERIFF'S
OFFICE; PATROLMAN MIGUEL SENA;
DEPUTY JAYME VIGIL;
UNDERSHERIFF MIKE PADILLA;
JOHN DOES, 1-10,

     Defendants - Appellees.

No. 24-2125

———————————————————————

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:21-CV-01222-KG-JMR)**

———————————————————————

Arturo B. Nieto of Nieto Law Office, LLC, Los Lunas, New Mexico, for Plaintiffs-Appellants.

Nicholas S. Autio (David M. Wesner with him on the brief), of NM Local Government Law, LLC, Albuquerque, New Mexico, for Defendants-Appellees San Miguel County, San Miguel County Sheriff's Office, Undersheriff Mike Padilla, and Deputy Jayme Vigil.

Haley R. Grant (Blaine T. Mynatt, with her on the brief), of Mynatt Springer P.C., Las Cruces, New Mexico, for Defendants-Appellees City of Las Vegas, Chief Adrian Crespin, and Sgt. Elias Rael.

Luis Robles of Robles, Rael & Anaya, P.C., Albuquerque, New Mexico, for Defendants-Appellees New Mexico Department of Public Safety, New Mexico State Police, Lt. Hugo Munoz, Sgt. Mark Lucero, and Patrolman Miguel Sena.

—————————————————

Before **HARTZ**, **MORITZ**, and **EID**, Circuit Judges.

—————————————————

**MORITZ**, Circuit Judge.

—————————————————

During an hours-long standoff with law enforcement in Las Vegas, New Mexico, Alejandro Alirez shot his girlfriend, Cristal Cervantes, and her grandfather, Victor Cervantes, inside their home. Alirez livestreamed the encounter on Facebook for nearly 51 minutes. Cristal was alive for much or all of the livestream. When Alirez finally surrendered, hours after the initial shots, she was beyond help. Neither Cristal nor Victor survived.

Angel Salcido, Cristal's personal representative, and Wanda Martinez, Cristal's mother, (together, plaintiffs) sued the responding law-enforcement agencies and officials[1] for failing to intervene, raising claims under 42 U.S.C. § 1983 and New Mexico state law. The district court granted defendants summary judgment across the

---

[1] Plaintiffs sued the City of Las Vegas, its police department, and several municipal employees (the City); San Miguel County, its sheriff's office, and several county employees (the County); and the New Mexico Department of Public Safety, the state police, and several state employees (the State) (together, defendants). Plaintiffs later removed the City's police department as a named defendant.

2

board, concluding that qualified immunity barred plaintiffs' § 1983 claim and that they couldn't succeed on their state-law claims.

On appeal, plaintiffs argue that defendants' inaction during the standoff (1) violated Cristal's clearly established due-process rights, so defendants are not entitled to qualified immunity under § 1983, and (2) breached New Mexico's statutory duty to investigate, so defendants are liable under multiple state-law theories. We disagree and affirm.

### Background[2]

On the afternoon of November 8, 2020, San Miguel County Sheriff's Deputy Jayme Vigil responded to Cristal Cervantes's residence to perform a welfare check after receiving a report that Alirez had arrived at her house acting "irate." App. vol. 3, 391. According to Vigil's information, Alirez was mentally ill and likely armed.

Vigil and fellow Sheriff's Deputy Devin Adkins arrived at Cristal's home around 2:59 p.m. and knocked on the metal security door. Seconds later, they heard a gunshot and a woman screaming. Adkins, gun drawn, tried to open the door. When he was unable to do so, both deputies took cover—first around the side of the house and then behind a patrol car—as they heard multiple shots in roughly 90 seconds.

Meanwhile, Alirez was livestreaming on Facebook the disturbing events going on inside. When the video starts around 3:00 p.m., he's already shot Cristal in the

---

[2] We take these facts from the summary-judgment record, viewing them in the light most favorable to the nonmoving party—here, plaintiffs. *See Duda v. Elder*, 7 F.4th 899, 910 (10th Cir. 2021).

stomach and fatally shot her grandfather. He accuses Cristal of raping his niece with a beer bottle and tells her to repent. She pleads for help. Then, on camera, Alirez shoots Cristal in the head. Two more gunshots are audible over the next minute, but the camera is obscured.[3]

The deputies radioed as Alirez fired, and dispatch recorded their real-time reports:

| | |
|---|---|
| 15:00:07 | . . . Shots fired |
| 15:00:15 | [Second] s[h]ot fired[;] heard . . . scream |
| 15:00:30 | . . . More sho[]ts fired |
| 15:03:00 | [Five] shots fired so far |
| 15:03:14 | Shooting out the window |
| 15:04:48 | Firing mul[ti]ple shots |
| 15:07:25 | Rounds hitting the car |
| 15:15:56 | Male subject still actively firing |
| 15:21:36 | More shots fired |

App. vol. 1, 108–10 nn.3–5 (cleaned up). Vigil heard the rounds hit the deputies' patrol cars, including the vehicle she and Adkins were taking cover behind, causing the front passenger tire to deflate. Adkins warned Vigil that Alirez was "shooting out the window"

---

[3] Although no one disputes that multiple shots were fired in these initial minutes of the encounter, the parties disagree about which shots in the Facebook video align with the initial shots the deputies heard. Given the posture, we adopt the version of events most favorable to plaintiffs, in which Cristal was shot in the stomach shortly after the deputies knocked on the door, and shot in the head soon thereafter, while the deputies were taking cover.

and "shooting towards" them, and they needed to prepare for Alirez to "come[] out blasting." App. vol. 3, 396.

Responding to the deputies' radio reports, the Sheriff's Office called for backup. Additional Sheriff's Office personnel, as well as officers from other agencies, responded to the scene. The Undersheriff instructed his deputies to establish a perimeter and maintain cover.

Las Vegas Police Department (LVPD) officers began arriving around 3:08 p.m., while Alirez was still actively shooting, and assisted in cordoning off the area. An LVPD officer, Sergeant Elias Rael, searched for Alirez on Facebook and discovered the livestream. He reported the livestream to the officers in charge and tasked another officer with monitoring the footage while he helped evacuate neighbors.

The New Mexico State Police (NMSP) began arriving around 3:14 p.m.— again, while Alirez was still actively shooting—and called in their tactical, crisis-negotiation, and explosive-ordnance teams shortly thereafter. While en route, the tactical team received updates on the livestreamed events.

The livestream video largely substantiates the deputies' reports to dispatch. Though Alirez remains mostly out of the camera's view, he returns periodically to speak to the camera or walk around the house with it, reiterating his claim that he is avenging his niece's sexual abuse and referencing the police, saying at one point: "someone called the cops[,] so I had to shoot, shoot these f***ers." App. vol. 4, 456. Roughly 27 minutes in, he promises to "shoot at these cops again" and, moments

later, fires another round through a window. App. vol. 2, 151. And around the 40-minute mark, in response to a comment on the livestream urging Alirez to talk to the police, Alirez replies, "F*** that. Tell these mother[]f***ers[,] you guys try and run in here[,] dog, I have bullets. I only have a few left." App. vol. 3, 400. Alirez repeatedly boasts of having killed two people but also sometimes says Cristal is still alive.

Around 3:51 p.m., the livestream ended. Around 4:12 p.m., NMSP crisis negotiators made contact with Alirez, who equivocated about whether Cristal was still alive and claimed to have artillery shells inside the house.

The NMSP tactical team then formed a plan to use chemical munitions to disorient Alirez and force him out. After the team deployed the munitions around 4:50 p.m., crisis negotiators advised that Alirez was still on the phone and likely had some type of mask on. Alirez later told crisis negotiators he would come out the back door. Around 5:25 p.m., he exited the home and was taken into custody.

Officers entered the house and found Cristal and her grandfather unresponsive inside. After Cristal was pronounced dead, a medical examiner determined that the bullet wound in Cristal's head was likely fatal.

Plaintiffs initially sued defendants in state court; defendants removed the action to federal court. Plaintiffs then filed an amended complaint, asserting a § 1983 claim for substantive-due-process violations, as well as several state-law tort claims—negligent investigation and causation of battery and wrongful death; negligent training, supervision, and retention; and loss of consortium.

After discovery commenced, defendants filed five motions for summary judgment and a motion for judgment on the pleadings, all of which the district court granted in separate orders.[4] Addressing plaintiffs' § 1983 claims, the district court concluded that defendants' failure to intervene did not violate Cristal's constitutional rights and thus defendants were entitled to qualified immunity. Turning to plaintiffs' state-law claims, the district court determined that defendants didn't breach any duty to investigate; didn't negligently cause Cristal's battery; didn't negligently train, supervise, or retain personnel; and couldn't be held liable for loss of consortium. The district court then entered judgment for defendants.

Plaintiffs appeal.

## Analysis

Plaintiffs maintain the district court erred when it granted summary judgment on (1) the § 1983 claims as barred by qualified immunity and (2) the state-law claims for negligent investigation; negligent training, supervision, and retention; and loss of consortium. We "review the grant of summary judgment de novo, construing all evidence and drawing any inferences in a light most favorable to" plaintiffs, as the party opposing summary judgment. *EagleMed LLC v. Cox*, 868 F.3d 893, 899 (10th

---

[4] The State and County each filed two summary-judgment motions: one on plaintiffs' § 1983 claim and one on their state-law claims. The City, however, filed a single summary-judgment motion addressing both § 1983 and state law but seeking qualified immunity as to the former only for individual LVPD officers. After the district court granted that motion, concluding LVPD officers hadn't violated Cristal's constitutional rights, the City filed a successful motion for judgment on the pleadings on plaintiffs' § 1983 claim on behalf of the remaining municipal defendants.

Cir. 2017) (quoting *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993)); *see also Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017) (applying same standard to summary judgment based on qualified immunity).[5]

## I.     Section 1983 Claim

We first address plaintiffs' contention that the district court erred in granting defendants qualified immunity under § 1983. To defeat an assertion of qualified immunity, a plaintiff must show "'(1) a violation of a constitutional right (2) that was clearly established' at the time of the violation." *Est. of Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2018) (quoting *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015)).

The constitutional violation plaintiffs assert springs from the Due Process Clause. Plaintiffs argue that defendants violated Cristal's substantive-due-process rights by failing to intervene once Alirez shot her. In plaintiffs' view, defendants' inaction placed Cristal in danger and resulted in her death; if they had rescued her quickly, Cristal may have survived, or so plaintiffs reason.

"As a general matter, . . . a [s]tate[ actor]'s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). But "there are two exceptions" under which plaintiffs can hold state actors liable for private violence. *Armijo ex rel. Chavez v. Wagon Mount Pub. Schs.*, 159

---

[5] Plaintiffs raise no independent challenge to the district court's grant of the City's judgment-on-the-pleadings motion. Accordingly, we need not separately address that decision.

F.3d 1253, 1260 (10th Cir. 1998). Under the first—the special-relationship doctrine—a state actor may be liable when "the state restrains an individual's freedom to act to protect himself or herself" and "thereby enter[s] into a 'special relationship'" requiring it "to protect that individual from violent acts." *Id.* at 1261. Under the second—the danger-creation doctrine—a state actor may be liable if the state "affirmatively acts to create[] or increase[] a plaintiff's vulnerability to[] or danger from private violence." *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).

The first exception doesn't apply here. We reserve the special-relationship doctrine for individuals "involuntar[ily] restrain[ed] by the government," *Armijo*, 159 F.3d at 1261, including through "incarceration," "institutionalization," or "involuntary foster care," *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 923 (10th Cir. 2012). Cristal was not so restrained.

The second exception is at issue. "To invoke the danger-creation theory, a plaintiff must show a state actor 'affirmatively acted to create or increase[] a plaintiff's vulnerability to[] danger from private violence.'" *T.D. v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017) (cleaned up) (quoting *Currier*, 242 F.3d at 923). The district court concluded that plaintiffs failed to show such an affirmative act.

Taking issue with the district court's assessment, plaintiffs say the doctrine applies because defendants' "failure to act constituted an affirmative act" that put Cristal in greater danger. Aplt. Br. 31. Plaintiffs explain that LVPD officers watched the livestream but took no action beyond "maintain[ing] a perimeter, evacuat[ing]

9

neighbors, and provid[ing equipment] to the [tactical] unit," *id.* at 20; sheriff's deputies prevented Alirez from leaving the house by maintaining a "conspicuous" presence around it, App. vol. 4, 514; and state police didn't "engage[] in any meaningful way" until crisis negotiators initiated contact, Aplt. Br. 27.

Yet plaintiffs fail to explain how this conduct created or marginally increased Cristal's vulnerability to danger beyond that created by Alirez's actions. Even accepting plaintiffs' timeline of events, Alirez shot Cristal in the stomach immediately on law enforcement's arrival. And, moments later, Alirez shot Cristal in the head. So as defendants explain, the steps law enforcement later took didn't create or increase the danger to Cristal. Simply said, Alirez, not law enforcement, put Cristal in danger.

Plaintiffs thus turn to attacking steps law enforcement *didn't* take, on the theory that inaction qualifies as an affirmative act. Not so. "[M]ere . . . inaction," *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013), "in the face of a known danger" of private violence, *Gray*, 672 F.3d at 918 n.7 (quoting *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994)), "is not enough" to trigger a due-process violation, *Est. of B.I.C.*, 710 F.3d at 1173. That's all we have here: an allegation that law enforcement failed to act in response to private violence.

Plaintiffs' best chance of rebutting this straightforward assessment lies with *Currier*. There, we observed that a social worker's conduct met the danger-creation theory because he "fail[ed] to investigate . . . numerous bruises and allegations of [child] abuse" and "recommend[ed] that" a possible abuser "assume legal custody" of

two abused siblings. *Currier*, 242 F.3d at 920. Although we found a due-process violation in part due to the social worker's inaction (that is, his failure to investigate), we clarified that we "viewed [his inaction] in the general context of the state's *affirmative conduct* in removing the children from their mother and placing [them] with their [abuser]." *Id.* at 920 n.7 (emphasis added). In other words, the defendant's inaction was only relevant "because it was coupled with" affirmative conduct that precipitated the danger. *T.D.*, 868 F.3d at 1224. Here, defendants did nothing to put Cristal in harm's way, so plaintiffs' reliance on *Currier* is misplaced.

To be sure, plaintiffs criticize defendants for waiting for the tactical team, citing statutory and policy-based duties to take necessary steps to protect life. But whether defendants' inaction violated statutory or policy-based duties is irrelevant. Officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision," let alone because it fell short of a theoretical ideal. *Tanberg v. Sholtis*, 401 F.3d 1151, 1159–60 (10th Cir. 2005) (quoting *Davis v. Scherer*, 468 U.S. 183, 194 (1984)).

Because plaintiffs failed to establish a basis to hold the defendant state actors liable for private violence under the danger-creation doctrine, we affirm the district court's decisions granting defendants qualified immunity on plaintiffs' § 1983 claim.

## II.    State-Law Claims

We turn now to plaintiffs' challenge to the district court's state-law, summary-judgment decisions. Although the district court analyzed four state-law theories of liability, plaintiffs explicitly press only three on appeal—negligent investigation;

11

negligent training, supervision, and retention; and loss of consortium. We begin with some background legal principles, then address plaintiffs' negligent-investigation arguments, and finally discuss implications for the remaining claims.

The New Mexico Tort Claims Act (NMTCA) waives immunity from civil liability for law-enforcement officers who, "while acting within the scope of their duties," "fail[] to comply with duties established pursuant to statute." N.M. Stat. Ann. § 41-4-12. As relevant here, New Mexico law makes it "the duty of every sheriff, deputy sheriff, constable[,] and every other peace officer to *investigate all violations* of the criminal laws of the state which are called to the attention of any such officer or of which he is aware." N.M. Stat. Ann. § 29-1-1 (emphasis added).

Relying on these provisions, plaintiffs assert that defendants are liable for breaching the duty to investigate because they failed to quickly intervene and rescue Cristal. Plaintiffs purport to find support for this theory in *Schear v. Board of County Commissioners*, which held that a plaintiff stated a claim for failure to investigate as provided in § 29-1-1 by alleging that police *never* responded to a crime-in-progress report. 687 P.2d 728, 729, 734 (N.M. 1984). But because there is no dispute that defendants investigated Alirez's crimes in some fashion, plaintiffs' theory depends on reading New Mexico law to impose a duty to investigate *reasonably* or *well*, not just *in some way*. Plaintiffs offer no authority compelling such an interpretation. And defendants cite a district-court opinion which declined to read § 29-1-1 as "creat[ing] a duty to investigate in a particular manner." *Ruff v. Bd. of Regents of Univ. of N.M.*, No. 16-1140, 2018 WL 565705, at *20 (D.N.M. Jan. 24, 2018) (unpublished).

12

At any rate, we can resolve this case without deciding the precise contours of the New Mexico duty to investigate. In *Methola v. Eddy County*, the New Mexico Supreme Court observed that the NMTCA "authorize[s] the filing of claims against governmental entities except in situations where the [s]tate *may not have been able to act for some specific reason*." 622 P.2d 234, 238 (N.M. 1980) (emphasis added); *see also Schear*, 687 P.2d at 673, 675–76 (favorably discussing *Methola* as providing the standard for NMTCA causation). *Methola*'s pronouncement aligns with the NMTCA's legislative declaration, which provides that "[l]iability for acts or omissions under the [NMTCA] shall be based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." N.M. Stat. Ann. § 41-4-2(B). Under traditional tort principles, an actor can't be held liable for breaching a duty imposed by "a legislative enactment"—such as the duty to investigate—if, among other circumstances, "compliance would involve a greater risk of harm to the actor or to others." Restatement (Second) of Torts § 288A (A.L.I. 1965); *see also Heath v. La Mariana Apartments*, 180 P.3d 664, 670 n.3 (N.M. 2008) ("A defendant can rebut an allegation of negligence per se with proof of an excuse for the violation . . . ." (citing Restatement (Second) of Torts § 288A) (A.L.I. 1965)); *Jackson v. Sw. Pub. Serv. Co.*, 349 P.2d 1029, 1038 (N.M. 1960) (adopting common-law test for "justification or excuse").

The district court heeded these limitations in concluding that plaintiffs' negligent-investigation claim against the County wasn't viable. It found that law enforcement couldn't rescue Cristal because "Alirez was actively shooting at" the

13

sheriff's deputies. App. vol. 4, 533. "And it is difficult to imagine a [circumstance] that better demonstrates when the state is prevented from acting than that presented here, where [defendants] were faced with such obvious, life-threatening danger." *Id*. That is, if officers did not investigate, it is only because Alirez's private violence prevented them from doing so, which, under *Methola* and traditional tort principles, precludes plaintiffs' negligent-investigation claims.

Significantly, on appeal, plaintiffs entirely fail to address the district court's determination that the officers' inability to act precluded liability under these facts, even when viewed in a light most favorable to plaintiffs. As such, we accept that in these circumstances, Alirez's violence prevented officers from intervening in the manner plaintiffs urge. We thus affirm judgment on plaintiffs' negligent-investigation claim for the County defendants.

Although the district court did not explicitly address the unable-to-act theory as to the other defendants, it implicitly adopted the same rationale in the order granting the State's summary-judgment motion, explaining that the State was not liable in part due to "the immediate deadly threat . . . Alirez continuously posed to law[-enforcement] officers." App. vol. 3, 327. Further, while the orders granting judgment to the City defendants did not reach this issue, we are free to "affirm on any basis supported by the record." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). And the undisputed record shows, as the district court found, that Alirez posed a continuing and deadly threat to law enforcement. He repeatedly threatened to kill officers and tried to make good on those threats by firing towards

14

the officers pinned down outside. The danger Alirez posed to law-enforcement officers prevented them from intervening and provides a clear and undisputed basis to affirm summary judgment for the City and State on the negligent-investigation claim.

With the negligent-investigation arguments resolved, we turn to plaintiffs' claims for negligent training, supervision, and retention, as well as loss of consortium. Plaintiffs, like the district court, view these claims as contingent on officers' allegedly tortious acts at the scene. That is, if the officers' response wasn't tortious, plaintiffs can't show that law-enforcement agencies failed to train, supervise, or retain personnel, nor was there a tortious loss of consortium. Because we reject plaintiffs' attempts to characterize the responding officers' conduct as tortiously failing to investigate, plaintiffs' remaining state-law claims are also nonviable. We thus affirm summary judgment in favor of defendants on the claims for negligent training, supervision, and retention, as well as loss of consortium.

## Conclusion

Because defendants did not affirmatively act to create or increase Cristal's vulnerability to danger, they did not violate her substantive-due-process rights. And because Alirez's violence prevented them from intervening to help Cristal, defendants can't be held liable under New Mexico law for their alleged inaction in this instance. We therefore affirm judgment in favor of defendants on plaintiffs' § 1983 and state-law claims.

24-2125, *Salcido v. City of Las Vegas*

**HARTZ**, J., concurring

I fully join the opinion of Judge Moritz. I write separately simply to remind litigators and the district courts of the virtues of dismissing supplemental-jurisdiction state-law claims without prejudice when the federal claims providing jurisdiction are dismissed before trial.

The virtues of this practice were first pronounced 60 years ago by the Supreme Court in *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), and they are still worth honoring, *see Tufaro v. Okla. ex rel. Bd. of Regents*, 107 F.4th 1121, 1144–52 (10th Cir. 2024) (Hartz, J., dissenting in part). The Supreme Court wrote, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. at 726. Thus, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.*

When, as here, the state-law claims raise issues not presented by the federal claims (so that the state-law claims would not be barred by preclusion doctrine in state court), we should let the state courts resolve the dispute. It conserves federal judicial resources, respects the role of state courts in deciding state law, and gives plaintiffs their preferred forums if the court first addresses dispositive motions on the federal claims and, if it grants those motions, then dismisses the state-law claims without prejudice.