FILED
United States Court of Appeals
Tenth Circuit

January 3, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARIO D. MARIN; REYES MARIN,

    Plaintiffs - Appellants,

v.

GARY KING, Attorney General of New
Mexico, individually; STEVEN S.
SUTTLE, Assistant Attorney General of
New Mexico, individually; HEATHER
FERGUSON GREENHOOD; PATRICIA
FEESER NORRIS, D.V.M.,

    Defendants - Appellees.

No. 16-2225
(D.C. No. 1:12-CV-00448-KG-KK)
(D. New Mexico)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

This case arises out of the execution of three search warrants on a New Mexico

ranch owned by Plaintiffs Mario and Reyes Marin.[1] The warrants were obtained and

executed as part of an investigation of an alleged cockfighting operation on

Plaintiffs' ranch. Members of the New Mexico Attorney General's Animal Cruelty

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Reyes Marin is Mario Marin's father. For the sake of clarity, we refer to
Reyes Marin as "Reyes" and to Mario Marin as "Mario."

Task Force (Task Force) actively contributed to the procurement and execution of the search warrants. In the process of executing the search warrants, New Mexico law enforcement officials seized and destroyed hundreds of Plaintiffs' hens, roosters, baby chickens, and eggs. But New Mexico never charged Plaintiffs with any crimes.

Plaintiffs filed this 42 U.S.C. § 1983 lawsuit against former New Mexico Attorney General Gary King, former New Mexico Assistant Attorney General Steven Suttle, New Mexico State Police Detective Max Salas, San Juan County Deputy Sheriff Bryce Current, San Juan County, and two private citizen volunteers serving on the Task Force—Heather Ferguson Greenhood ("Ms. Ferguson") and Dr. Patricia Feeser Norris ("Dr. Norris"). Plaintiffs claimed that Ms. Ferguson and Dr. Norris violated their Fourth, Fifth, and Fourteenth Amendment rights, and that Mr. King and Mr. Suttle were liable under a theory of supervisory liability.[2] The remaining Defendants moved for summary judgment based on qualified immunity and the district court granted each motion. Plaintiffs appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND

In this section, we begin with a brief overview of the facts underlying this dispute. We then provide the procedural history giving rise to this appeal.

---

[2] During the course of proceedings below, Plaintiffs settled their claims against Mr. Current, San Juan County, and Mr. Salas; thus Mr. Current, San Juan County, and Mr. Salas are not parties to this appeal.

## A. *Factual History*

### 1. The Task Force

In 2007, then-Attorney General Gary King organized the Task Force as a "policy group" to "engage in lobbying and other efforts aimed at the generation of new animal cruelty laws" and to "facilitate information sharing between state and local law enforcement agencies regarding the implementation of new and existing animal cruelty laws." App. at 416. The Task Force was also intended to support the enforcement of animal fighting laws. But it was not designed to "have any independent authority to conduct any law enforcement activities." *Id.* at 417.

The Task Force was an ad hoc group for sharing information that consisted of individuals who were interested, or had an expertise, in animal cruelty laws. The Task Force met periodically and representatives of several local law enforcement authorities attended the meetings at various times. The Task Force included employees of the Attorney General's Office, local law enforcement officials, and private citizens, such as Ms. Ferguson and Dr. Norris. While the Task Force had no formal membership, titles, or appointment process, Mr. King was known as the Task Force's "chair," Mr. Suttle was known as its "head," Ms. Ferguson was known as its "coordinator," and Dr. Norris was its forensic veterinarian. Ms. Ferguson and Dr. Norris were unpaid citizen volunteers. Neither was an employee of the Attorney General's Office or received any law enforcement training as a prerequisite to, or as part of, her service on the Task Force. At all relevant times, Ms. Ferguson was an employee of a non-profit entity called Animal Protection for New Mexico.

3

While Mr. King avers that there was no "policy under which the Task Force would conduct raids related to enforcement of animal cruelty laws," *id.* at 417, it is undisputed that, in 2008 and 2009, Ms. Ferguson and Dr. Norris accompanied law enforcement officials, from various local entities, during the execution of search warrants on private property. In some instances, officials seized and euthanized animals that appeared to be involved in illegal dogfighting or cockfighting. Although neither Mr. King nor Mr. Suttle personally attended the raids, Ms. Ferguson kept them both apprised of the Task Force's involvement in the raids.

### 2. The Searches of Plaintiffs' Ranch

On April 29, 2009, Mr. Salas sought a warrant to search Plaintiffs' New Mexico ranch. In his Affidavit for Search Warrant, Mr. Salas averred that, a few days prior, Mr. Current asked him to serve as the lead investigator on a possible cockfighting operation at Plaintiffs' ranch. According to Mr. Salas, Mr. Current stated his office learned about the cockfighting operation through a confidential informant (CI). Mr. Current then confirmed elements of the CI's report during a helicopter ride over Plaintiffs' ranch. Mr. Salas's affidavit also indicated he met with another detective who had learned from a second CI that cockfighting events were occurring at Plaintiffs' ranch. The detective informed Mr. Salas that the second CI provided information about two other cockfighting operations in New Mexico, and that "[Ms.] Ferguson with the Attorney General's Office Animal Cruelty Task Force . . . said the information the [second] CI gave had been verified." *Id.* at 684. Based on

4

Mr. Salas's affidavit, a magistrate judge issued a search warrant (the First Warrant) the same day Mr. Salas requested it.

Mr. Salas, Mr. Current, and other law enforcement officials executed the First Warrant on Plaintiffs' ranch. Ms. Ferguson and Dr. Norris accompanied Mr. Salas and his officers. While executing the warrant, officials found evidence of cockfighting and animal cruelty. Mr. Salas observed that all the roosters were either on leashes or housed in fifty-five gallon plastic drums. He also saw a Hogan-type structure,[3] which he believed was used as a cockfighting arena. Mr. Salas and the other officials seized numerous items believed to be used for cockfighting.[4] Dr. Norris assisted in the search by examining over one-hundred birds believed to be trained and used for cockfighting. Dr. Norris opined that sixteen of the birds were in "poor condition," so Mr. Salas seized them. *Id.* at 894.

When Mario arrived at the ranch, Mr. Salas introduced himself as "the lead investigator" and stated he was there to "serve a search warrant in connection with roosters on the property." *Id.* at 776. Mario later explained the roosters would kill each other if they were not penned, as that is what they had been bred to do. Mario

---

[3] A Hogan structure is "a conical, hexagonal, or octagonal dwelling characteristic of the Navaho Indian made with a door traditionally facing east and constructed of logs and sticks covered with mud, sods, or adobe or sometimes of stones." Webster's Third New International Dictionary 1076 (2002).

[4] The items seized included "7 leather straps believed to be used for fighting game cocks," "4 wrapped bindles of used twine believed to be used to tie sharp instruments on game cocks," "1 maroon ledger believed to be used for documenting gambling sessions," "4 leather sparring cockfighting gloves," and "7 unused multipurpose blades." App. at 689.

also told Mr. Salas that he and his father "reminisce about old times and throw on the knives and fight the chickens sometimes." *Id.* at 894. During the ensuing conversation, it became apparent to Mr. Salas that Plaintiffs injected their birds with antibiotics and kept no records of which birds had been treated and which birds had not. Mr. Salas also noted that Plaintiffs did not state whether the medicines in their possession were prescribed by a licensed veterinarian.

During the search, Ms. Ferguson rode in a helicopter over the ranch to better observe the property. Mario avers in his affidavit that Mr. Current told him Ms. Ferguson wanted Plaintiffs to sign over all the roosters on the ranch to state custody. Mr. Current explained to Mario that Ms. Ferguson was with the Attorney General's Office and in charge of the search. Mr. Current and Mr. Salas then told Plaintiffs the roosters were to be put down. When Plaintiffs refused to relinquish the birds, Mr. Current and Mr. Salas informed Plaintiffs that they would be charged $6 a day per bird if the birds had to be taken into custody rather than destroyed. This would have required Plaintiffs to pay thousands of dollars per day. Mr. Current and Mr. Salas "made clear that [Ms.] Ferguson was the person who had given them this information." *Id.* at 778. After speaking with Ms. Ferguson by telephone, Mr. Current informed Plaintiffs they could face felony charges if they did not give permission to euthanize the birds. Plaintiffs did not acquiesce to the destruction of all the birds at that time. But upon learning Dr. Norris had identified sixteen birds in poor condition and that Mr. Salas was going to seize them, Reyes signed a form consenting to the removal and destruction of those sixteen birds.

6

On May 1, 2009, Mr. Salas sought another search warrant for Plaintiffs' ranch. Mr. Salas's supporting affidavit stated that he had a discussion with Ms. Ferguson on April 30, during which she indicated that the remaining roosters and hens at the ranch needed to be euthanized "due to the contamination by the steroids found at the location which, according to the Federal Drug Administration (FDA) and United States Department of Agriculture (USDA), are illegal to administer to poultry." *Id.* at 690. Mr. Salas further reported that Ms. Ferguson explained the steroids "could potentially enter the food supply chain [and] contaminate other poultry populations in the state." *Id.* And Mr. Salas averred that Ms. Ferguson claimed she was coordinating with the USDA so its veterinarians could test and assess the seized poultry. Mr. Salas also spoke to Dr. Norris, who stated that TA 333, DSP and AMP-2500, the medications seized from Plaintiffs' ranch during execution of the First Warrant, are long- and short-term steroids, respectively. According to Mr. Salas's affidavit, Dr. Norris also said that possession of those steroids is a felony under federal guidelines, the FDA has very strict regulations on what medications can be used in food-producing animals, the medications found are not allowed in poultry, and it is a violation of federal and state regulations to medicate a bird with a controlled substance. The magistrate issued the warrant that day (the Second Warrant).

On the day the magistrate issued the Second Warrant, Mr. Salas and other law enforcement officials appeared at Plaintiffs' property to execute the Second Warrant. Ms. Ferguson again was present. A state police officer introduced Mario to Ms. Ferguson, who identified herself as the Task Force's coordinator. Ms. Ferguson

7

informed Mario that the law enforcement officials had returned for the birds, and that there would be a charge of $3 a day per bird if they had to be taken into custody instead of being destroyed. Ms. Ferguson also told Plaintiffs that the Attorney General's Office was working on legislation to increase the severity of charges available for game fowl fighting and that those laws, if passed, would apply retroactively to Plaintiffs. And she told the Plaintiffs that federal and state charges would be filed for the steroids found on the property. Ms. Ferguson and Mr. Salas further advised that judges would be more lenient on the Plaintiffs if they cooperated with law enforcement.

Reyes then signed the paperwork transferring custody of the birds to the state. At that point, Ms. Ferguson instructed law enforcement officials to count the birds on the property. In all, they counted 668 birds. Ms. Ferguson told Mr. Salas that the birds should remain at the property until May 4, 2009, when the USDA would report to the ranch and euthanize the birds.

But, on May 2, 2009, Ms. Ferguson informed Mr. Salas that the USDA would not euthanize the birds. So on May 4, 2009, Mr. Salas drafted a third Affidavit for Search Warrant. The third Affidavit for Search Warrant restated the facts averred in the second Affidavit for Search Warrant and sought authority to seize all fighting cocks, gamefowl, roosters, and hens that were illegally injected with medications, as well as any poultry, including eggs and baby chickens, that had been contaminated by the "illegal use of prescribed medications and the illegal use of anabolic steroids." *Id.* at 692–95. A magistrate issued a warrant that day (the Third Warrant).

Later that day, Mr. Salas and other officials returned to Plaintiffs' ranch to execute the Third Warrant. Ms. Ferguson again attended. Mr. Salas advised Plaintiffs he was there to destroy the birds. Reyes again signed paperwork turning custody of the birds over to the state. Law enforcement officials then seized 435 hens and roosters, 285 baby chickens, and 200 eggs. Animal Control destroyed them all. No arrests were made, nor were any citations issued.

## B. *Procedural History*

On April 27, 2012, Plaintiffs initiated this § 1983 lawsuit, claiming that two aspects of the raids violated their federal constitutional rights. First, Plaintiffs alleged that Ms. Ferguson and Dr. Norris violated their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures because the Second and Third Warrants were based upon knowingly false statements that Ms. Ferguson and Dr. Norris provided to Mr. Salas. Second, Plaintiffs contended that Ms. Ferguson and Dr. Norris violated their Fifth and Fourteenth Amendment rights not to be deprived of property without due process of law when Ms. Ferguson coerced them, through false statements, into consenting to the destruction of their roosters, hens, baby chickens, and eggs. Plaintiffs maintained that Mr. King and Mr. Suttle are responsible for the constitutional violations committed by Ms. Ferguson and Dr. Norris under a theory of supervisory liability.

On June 29, 2012, Mr. Suttle moved for summary judgment based on qualified immunity. After stressing that the Task Force did not have any authority to conduct searches, and that Mr. Suttle thus had no authority to command its members to do so,

9

the district court concluded that "there existed no supervisory relationship between [Mr.] Suttle and [Ms.] Ferguson sufficient to hold [Mr.] Suttle liable for any of [Ms.] Ferguson's alleged constitutional violations." *Id.* at 362. The court then ruled that even if Mr. Suttle was Ms. Ferguson's supervisor, Mr. Suttle is still entitled to qualified immunity because "the law was not sufficiently established to put a reasonable official in [Mr.] Suttle's position on notice that his behavior violated Plaintiffs' rights." *Id.*[5]

On May 9, 2013, Mr. King moved for summary judgment on qualified immunity grounds. Mr. King simultaneously moved to stay discovery pending the resolution of his motion for summary judgment. On May 28, 2013, pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004), the Magistrate Judge granted Mr. King's motion to stay "all discovery" pending the resolution of his motion for summary judgment. The Magistrate Judge explained, "[s]hould Plaintiffs believe that further discovery is necessary to allow them to respond to the motion for summary judgment, they are privileged to file a [Rule] 56(d) affidavit." App. at 493.

---

[5] On April 8, 2013, Plaintiffs moved the court to reconsider its ruling on Mr. Suttle's motion for summary judgment. In their motion, Plaintiffs relied on newly-discovered emails between Mr. Suttle, Mr. King, Ms. Ferguson, other members of the Task Force, and the Attorney General's Office. These emails were obtained through an Inspection of Public Records Act request served on the Attorney General's Office by an individual who is not a party to this case. The court denied the motion for reconsideration, concluding that the newly-discovered evidence was either similar in nature to evidence already in the record or not probative on the issues dispositive to resolution of Mr. Suttle's motion for summary judgment.

10

On July 12, 2013, Ms. Ferguson and Dr. Norris moved for summary judgment, advancing a qualified immunity defense. Although Ms. Ferguson and Dr. Norris did not join Mr. King's motion to stay discovery, counsel for the parties agreed that the Magistrate Judge would continue the existing stay of discovery and apply it as to the claims against Ms. Ferguson and Dr. Norris because Ms. Ferguson and Dr. Norris also asserted a qualified immunity defense. With the stay pending, Plaintiffs moved to depose Mr. Salas and Mr. Current, but the Magistrate Judge denied the motion.

Subsequent to the denial of their motion to depose Mr. Salas and Mr. Current, Plaintiffs reached a settlement agreement with Mr. Current and San Juan County. As part of the settlement agreement, Mr. Current agreed to be interviewed by Plaintiffs' counsel about Ms. Ferguson's and Dr. Norris's actions at Plaintiffs' ranch. The interview occurred on January 17, 2014, before a court reporter and while Mr. Current was under oath. Only Plaintiffs' counsel was present at the interview. On January 22, 2014, the district court, pursuant to the parties' stipulation, dismissed the claims against Mr. Current and San Juan County with prejudice.

On January 31, 2014, Plaintiffs moved to supplement the record on the pending motions for summary judgment with the transcript of Mr. Current's interview. Plaintiffs argued that the transcript is similar to an affidavit and therefore does not violate the orders staying discovery and denying Plaintiffs' Rule 56(d) request to depose Mr. Current. Ms. Ferguson and Dr. Norris responded by moving to

11

strike the transcript from the record.[6]

On October 29, 2015, the district court denied the motion to supplement the record and granted the motion to strike the transcript. First, the court addressed the motion to supplement, noting that the Tenth Circuit addressed a similar issue in *Martinez v. Carson*, 697 F.3d 1252 (10th Cir. 2012). The court then ruled that, as in *Martinez*, the interview was deposition-like and thus in violation of the Magistrate Judge's orders staying discovery and denying Plaintiffs' request to depose Mr. Current. The court next granted Ms. Ferguson and Dr. Norris's motion to strike the transcript from the record as a sanction for violating the spirit, if not the letter, of the Magistrate Judge's orders. Although Ms. Ferguson and Dr. Norris requested relief under Fed. R. Civ. P. 12(f) and 37(b)(2)(A), the district court exercised its inherent powers to impose sanctions in response to abusive litigation practices.

Having stricken the transcript of Mr. Current's interview, the district court, in separate orders, addressed Mr. King's motion for summary judgment and Ms. Ferguson's and Dr. Norris's motion for summary judgment. As to Mr. King, the district court concluded that Mr. King was not Ms. Ferguson's supervisor. The court then explained that a "reasonable jury could not find that [Mr.] King promulgated, created, or implemented a policy that harmed Plaintiffs." *Id.* at 1109. Nor could a reasonable jury "find a causal connection between [Mr.] King's actions and [Ms.] Ferguson's allegedly untruthful statements," which formed the basis for Plaintiffs'

---

[6] Ms. Ferguson and Dr. Norris also requested an award of attorney's fees and costs, which the district court denied. This ruling is not challenged on appeal.

12

constitutional claims. *Id.* at 1109–10. And because "[Mr.] King neither directed the raid on Plaintiffs' ranch nor knew or suspected that [Ms.] Ferguson would give false statements in connection with the raid," the court also concluded that "a reasonable jury could not find that [Mr.] King had the requisite recklessness, gross negligence, or deliberate indifference necessary to support a supervisory liability claim." *Id.* at 1110. Finally, the court ruled that [Mr.] King was entitled to qualified immunity because "it is unclear . . . that a reasonable official in [Mr.] King's position as chairman of an advisory task force would understand that what he was doing violated Plaintiffs' Fourth Amendment and due process rights." *Id.* at 1112.

As to Ms. Ferguson's and Dr. Norris's joint motion for summary judgment, the district court concluded that they were entitled to qualified immunity on both of Plaintiffs' claims. First, the court ruled that Plaintiffs' Fourth and Fourteenth Amendment claims failed on the clearly established prong of the qualified immunity analysis because

> a reasonable Task Force member would not be on fair notice or understand that providing information, whether false or otherwise, to a law enforcement official, who has a duty to investigate relevant information prior to obtaining and executing a search warrant, would result in an unlawful search warrant and, thus, violate a plaintiff's constitutional rights.

*Id.* at 1120. Second, the court determined Ms. Ferguson did not violate Plaintiffs' Fifth and Fourteenth Amendment rights because no reasonable jury could find that Ms. Ferguson made knowingly false statements to Reyes in order to coerce him into consenting to the destruction of the roosters, hens, baby chickens, and eggs.

13

## II. DISCUSSION

On appeal, Plaintiffs maintain the district court erred in granting summary judgment to Defendants on qualified immunity grounds. They also contend the district court abused its discretion when it struck the transcript of an interview with Mr. Current from the record because Plaintiffs conducted the interview and submitted the transcript while discovery was stayed. We address Plaintiffs' challenge to the district court's striking of the transcript of Mr. Current's interview first because the inclusion or exclusion of the transcript impacts the facts from which we may draw reasonable inferences for purposes of our qualified immunity analysis.

### A. *The Discovery Sanction*

Plaintiffs argue the district court abused its discretion when it struck the transcript of an interview with Mr. Current as a sanction for violating the discovery stay in place at the time of the interview. We conclude the district court was within its discretion to strike the transcript. We first provide the standard of review and then provide our analysis.

#### 1. Standard of Review

"We review a district court's order of discovery sanctions for abuse of discretion." *Martinez v. Carson*, 697 F.3d 1252, 1256 (10th Cir. 2012). "A district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 822 (10th Cir. 2014).

#### 2. Analysis

14

All parties agree that a district court may stay discovery pending the resolution of a motion for summary judgment based on qualified immunity. *See Stonecipher v. Valles*, 759 F.3d 1134, 1148 (10th Cir. 2014) ("[B]ecause qualified immunity protects against the burdens of discovery as well as trial, a district court may stay discovery upon the filing of a dispositive motion based on qualified immunity."). Nonetheless, Plaintiffs contend the district court here exceeded its discretion in doing so. We disagree and conclude that *Martinez*, 697 F.3d 1252, controls our analysis.

In *Martinez*, plaintiffs brought a § 1983 lawsuit against two New Mexico Department of Corrections employees and several other Rio Rancho police officers. 697 F.3d at 1254. Following *Iqbal*, the magistrate judge stayed all discovery pending the resolution of defendants' motion for summary judgment based on qualified immunity. *Id.* at 1256. The magistrate judge, however, invited plaintiffs to file a Rule 56(f) (now Rule 56(d)) motion if they believed that some discovery was necessary in order to respond to the pending motion for summary judgment. *Id.* Plaintiffs accepted the invitation and filed a Rule 56(f) motion to depose some defendants. *Id.* The very next day, before receiving a response to the Rule 56(f) motion, plaintiffs conducted consensual interviews of the Rio Rancho defendants. *Id.* at 1256–57. Plaintiffs did not notify the magistrate judge or the other defendants of the interviews. *Id.* at 1257. The interviews proceeded like depositions, with the Rio Rancho defendants being asked extensive questions under oath by plaintiffs' counsel. *Id.*

Three days after the interviews occurred, the magistrate judge—who was unaware of the interviews—granted in part plaintiffs' Rule 56(f) motion to allow

15

them to conduct limited depositions of defendants. *Id.* Having already conducted deposition-like interviews with the Rio Rancho defendants, plaintiffs had the recordings of the interviews transcribed by a court reporter. *Id.* They then used that transcript in their response to defendants' motion for summary judgment. *Id.* Defendants moved to strike the transcript, arguing that plaintiffs conducted these deposition-like interviews in violation of the stay order. *Id.* at 1254. The district court concluded that the interviews violated the discovery stay, "if not technically, then in spirit." *Id.* at 1257. The court stated that while plaintiffs could have prepared a traditional affidavit from the contents of the recorded statement, the recorded interviews possessed characteristics of a discovery proceeding. *Id.* The court also explained that "[c]ounsel did not simply conduct voluntary interviews of the Rio Rancho defendants for investigatory or settlement purposes." *Id.* Instead, "counsel conducted a deposition-like proceeding with these defendants, using exhibits and asking extensive questions to obtain evidence against the other defendants whose counsel was not noticed to be present." *Id.* Thus, the court struck the transcript, ordered the parties to proceed with the Rule 56(f) deposition with plaintiffs bearing the costs, and denied without prejudice the pending motions that included citations to the stricken transcript. *Id.* at 1254, 1257.

On appeal, we concluded that "the district court did not abuse its discretion in holding that plaintiffs violated the magistrate judge's stay order." *Id.* at 1257. First, "[t]he magistrate judge's stay order clearly stayed 'all discovery.'" *Id.* Second, with the pending stay of all discovery, it was not overly burdensome to expect plaintiffs to

16

wait less than a week to take the depositions, depositions that the magistrate judge ultimately granted leave to conduct. *Id.* And third, plaintiffs "did not simply exercise their First Amendment right to participate in settlement discussions." *Id.* "Rather, they obtained deposition-like evidence they then attempted to use precisely like a deposition in their summary judgment pleadings." *Id.*

Here, we similarly conclude the district court did not abuse its discretion when it struck the transcript of Mr. Current's consensual interview. Plaintiffs conducted the interview with Mr. Current despite the Magistrate Judge's orders clearly staying "all discovery" and denying Plaintiffs' Rule 56(d) motion to depose him. The interview was conducted under oath and was deposition-like, with Plaintiffs' counsel asking Mr. Current extensive questions about the searches. Plaintiffs conducted the interview to obtain evidence against the other Defendants—whose counsel were not present—and to rebut the facts asserted in Defendants' pending motions for summary judgment. The transcript also does not at all resemble a traditional affidavit. Thus, the district court did not abuse its discretion when it concluded that Plaintiffs violated the spirit, if not the letter, of the Magistrate Judge's orders staying discovery and denying Plaintiff's Rule 56(d) motion to depose Mr. Current. The court was within its discretion to strike the transcript.

Plaintiffs contend counsel was unaware of *Martinez* at the time they agreed to dismiss their claims against Mr. Current in exchange for a sworn statement. Even if counsel's unawareness of a controlling decision were somehow an excuse to violate a court's orders—which it is not—we decided *Martinez* in October 2012, well before

17

Plaintiffs began negotiating with Mr. Current in late 2013. Plaintiffs interviewed Mr. Current on January 17, 2014. On January 22, 2014, the district court filed an order dismissing Mr. Current as a party.

Plaintiffs next insist that "*Martinez* was wrongly decided because taking witness interviews, in whatever format counsel elects, is not an activity that falls within the rules of discovery." Appellant's Br. at 54. According to Plaintiffs, *Martinez* effectively suppresses the truth by preventing plaintiffs from being able to rebut facts asserted by defendants in their motions for summary judgment that are based on qualified immunity. But the district court was bound by *Martinez*. And so are we. Under the doctrine of stare decisis, we are bound by the decision of another panel absent en banc reconsideration, a superseding contrary Supreme Court decision, or authorization of all currently active judges on the court. *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010) (citing *United States v. Edward J.*, 224 F.3d 1216, 1220 (10th Cir. 2000)). None of these circumstances are present.

Also, *Martinez* does not in all cases prevent plaintiffs from obtaining additional discovery when faced with a motion for summary judgment based on qualified immunity. As the Magistrate Judge here noted, Plaintiffs were free to file a Rule 56(d) motion if they believed further discovery was necessary to respond to the pending motions. Sure, Plaintiffs filed a Rule 56(d) motion. And the Magistrate Judge denied it. But had Plaintiffs met their burden under *Ben Ezra, Weinstein & Co. v. America Online Inc.*, 206 F.3d 980 (10th Cir. 2000), Plaintiffs would have been permitted to depose Mr. Current (and Mr. Salas). *See* App. at 819 (denying Plaintiffs

18

Rule 56(d) motion because they "have not met the *Ben Ezra* standard by articulating precisely how additional discovery will lead to a genuine issue of material fact" (internal quotation marks omitted)). Alternatively, Plaintiffs maintain this case is distinguishable from *Martinez* in that while the magistrate judge in *Martinez* eventually allowed plaintiffs to depose defendants, the Magistrate Judge here explicitly refused to allow the deposition of Mr. Current. Plaintiffs therefore insist the result is the suppression of Mr. Current's testimony. While that may be true, any refusal by the Magistrate Judge to allow the deposition is the product of Plaintiffs' failure to meet their Rule 56(d) burden under *Ben Ezra*. Further, a sanction is more appropriate here than it was in *Martinez* because Plaintiffs violated not only one—but two—of the Magistrate Judge's orders and because Plaintiffs' counsel's conduct ran contrary to this court's controlling decision in *Martinez*.

Finally, Plaintiffs contend "agreeing to a dismissal in return for a statement under oath did not have the effect of imposing litigation and discovery obligations on [Mr.] Current, but had the effect of releasing him from them." Appellant's Br. at 55; *see also* Reply Br. at 24 ("In this case, Plaintiffs' counsel interviewed [Mr.] Current, a witness that was, at the time, not a party to the proceeding and who voluntarily submitted to the interview."). But when Plaintiffs interviewed Mr. Current, he was still a party in this case: Plaintiffs interviewed Mr. Current on January 17, 2014, but the district court did not dismiss the claims against him until January 22, 2014. And, in any event, the deposition of a non-party still falls within the purview of the rules governing discovery. *See* Fed. R. Civ. P. 30(a)(1) ("A party may, by oral questions,

19

depose *any person,* including a party . . . ." (emphasis added)); Fed. R. Civ. P. 30(b)(1) ("A party who wants to depose *a person* by oral questions must give reasonable written notice to every other party." (emphasis added)); *see also* Fed. R. Civ. P. 45(a)(1)(B) and (c)(1) (providing for subpoena of non-party for purpose of taking deposition).

We conclude that this case is not meaningfully distinguishable from *Martinez*, and that the district court did not abuse its discretion in striking the transcript of Mr. Current's interview.

### B. *The Motions for Summary Judgment*

We affirm the district court's grant of summary judgment to Ms. Ferguson, Dr. Norris, Mr. King, and Mr. Suttle on qualified immunity grounds. Before addressing the propriety of granting summary judgment in their favor, we first provide the applicable standard of review and legal standards.

### 1. Standard of Review

We review de novo the district court's grant of summary judgment, applying the same legal standard as the district court. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Bryant*, 432 F.3d at 1124. "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury

20

could find in favor of the nonmoving party on the evidence presented." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (citation omitted).

### 2. Section 1983 and Qualified Immunity

A person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. "The traditional definition of acting under color of state law requires that the defendant in a [42 U.S.C.] §1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotation marks omitted). Liability under § 1983 can extend beyond officers employed by the state as "[p]rivate persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [§ 1983]."[7] *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity."[8] *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017).

---

[7] Here, the parties agree that Ms. Ferguson and Dr. Norris acted under color of state law, and such is consistent with *Adickes*'s statement about joint activity.

[8] Plaintiffs did not contend below, nor do they contend in this court, that Ms. Ferguson and Dr. Norris are unable to avail themselves of a qualified immunity defense because of their status as private citizens. *See* App. at 829–845; Appellants' Br. at 27–41. *But see United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 479–83 (6th Cir. 2014) (concluding that private citizen tasked by city, through private employer, with performing animal-welfare duties, including inspecting businesses selling pets, was not entitled to raise qualified immunity defense where

Qualified immunity "shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." *Id.* And it "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Qualified immunity "is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Estate of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009)).

When an individual defendant moves for summary judgment based on qualified immunity, we apply a modified summary judgment standard. *See Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). In such a case, the plaintiff must satisfy a "heavy two-part burden." *Estate of Redd*, 848 F.3d at 906. He must show "(1) that the defendant's actions violated a federal constitutional or statutory right, and . . . (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Patton*, 868 F.3d at 1220. "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

---

she was not commissioned as a special police officer). In the absence of Plaintiffs' having raised this argument, we will assume, for the purposes of this appeal, that Ms. Ferguson and Dr. Norris may advance a qualified immunity defense. *See Wood v. Milyard*, 566 U.S. 463, 473 (2012) ("For good reason, appellate courts ordinarily abstain from entertaining issues that have not been raised and preserved in the court of first instance. That restraint is all the more appropriate when the appellate court itself spots an issue the parties did not air below . . . ." (citation omitted)).

A right is clearly established if, at the time of the relevant conduct, "existing precedent . . . placed the statutory or constitutional question beyond debate." *Patton*, 868 F.3d at 1220 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). This standard usually "requires either that there is a Supreme Court or Tenth Circuit decision on point, or that the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains." *Patel*, 849 F.3d at 980 (internal quotation marks omitted). Although a prior case need not have identical facts, *id.*, "an officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite *that any reasonable official in his shoes would have understood that he was violating it*," *Patton*, 868 F.3d at 1220 (emphasis added) (quoting *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)). We "must not define clearly established law at a high level of generality." *Id.* (internal quotation marks omitted). "Instead, the clearly established law must be particularized to the facts of the case." *Id.* (internal quotation marks omitted). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (internal quotation marks omitted). Finally, we may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 3. Analysis

We first address Plaintiffs' claims against Ms. Ferguson and Dr. Norris. We then turn to Plaintiff's supervisory-liability claims against Mr. King and Mr. Suttle.

#### a. *Ms. Ferguson and Dr. Norris*

Plaintiffs contend that Ms. Ferguson and Dr. Norris violated Plaintiffs' Fourth and Fourteenth Amendment rights, as well as their Fifth and Fourteenth Amendment rights. We address each contention in turn.

##### i. Fourth and Fourteenth Amendment Claim

According to Plaintiffs, Ms. Ferguson and Dr. Norris violated their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures because the search warrants were executed based on knowingly false statements Ms. Ferguson and Dr. Norris made to Mr. Salas. The district court concluded that Plaintiffs' claim fails under the requirement that the law must be clearly established at the time the challenged conduct occurred. We agree.

The Fourth Amendment, which applies to states through the Fourteenth Amendment, *see New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985), provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation," U.S. Const. amend. IV. "When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (internal quotation

24

marks omitted). "Truthful" does not mean every fact recited in an affidavit in support of a warrant is necessarily correct; "truthful" means "the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165. Thus, an affiant violates the Fourth Amendment when he "knowingly and intentionally, or with reckless disregard for the truth," includes a false statement in the warrant affidavit. *Id.* at 155–56.

Here, there is no suggestion that Mr. Salas knew that any of Ms. Ferguson's or Dr. Norris's assertions included in his second and third affidavits were untrue. But *Franks* is not limited to false representations made by the affiant himself. A government official cannot "insulate [his] deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Id.* at 163 n.6. Thus, we have held "the government accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997); *see also United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995) (holding that a deliberate or reckless omission by an informant can serve as grounds for a *Franks* suppression where the informant is a government official, but not when the informant is a private individual); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992) (concluding that "misstatements or omissions of government officials [who are not the affiant] which are incorporated in an affidavit for a search warrant are grounds for a *Franks* hearing, even if the official at fault is

25

not the affiant"); *United States v. Calisto*, 838 F.2d 711, 714 (3d Cir. 1988) ("If we held that the conduct of [the affiant] was the only relevant conduct for the purpose of applying the teachings of *Franks*, we would place the privacy rights protected by that case in serious jeopardy."); *United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir. 1984) (stating that *Franks* applies when "one *government agent* deliberately or recklessly misrepresents information to a second agent, who then innocently includes the misrepresentations in an affidavit").

Plaintiffs argue that Ms. Ferguson and Dr. Norris advanced at least three lines of false assertions relied on by Mr. Salas in his affidavits that supported the Second and Third Warrants. First, Dr. Norris said that TA 333, DSP and AMP-2500 were long- and short-term steroids, respectively; that the possession of those steroids is a felony; that they are not allowed in poultry; and that they are controlled substances. Plaintiffs claim that these statements are false because TA 333, DSP is available over-the-counter; is a hormone promoting weight gain, bone density, and red cell production; and is commonly used by poultry breeders. Likewise, Plaintiffs claim that AMP-2500 is also available over-the-counter; is used to promote glycogenolysis in chickens; is useful in creating sexual stamina in roosters; and is not associated with cockfighting, but instead with lawful game fowl breeding.

Second, Ms. Ferguson stated that she was coordinating with the USDA so its veterinarians could test and assess the seized poultry. Plaintiffs contend this statement is false because the USDA had no jurisdiction over the matter, as Ms. Ferguson herself later conceded.

26

Third, Ms. Ferguson stated that the remaining roosters and hens at Plaintiffs' property had to be euthanized because of the potential that the roosters that had been injected with steroids could contaminate the rest of the flock, which in turn could contaminate poultry all over New Mexico. Plaintiffs maintain this statement is false because, according to D'Renda Lewis of the Alabama Gamefowl Breeders Association, it is "absurd" to believe that a steroid can spread to other roosters or hens, as supplements and medications are not contagious.

Even if we assume, for purposes of our qualified immunity analysis, that the statements Ms. Ferguson and Dr. Norris made to Mr. Salas were material and knowingly and intentionally, or recklessly, false, Plaintiffs fail to establish that the right asserted was clearly established in a particularized sense at the time of the relevant conduct. To be sure, the law was generally established by 2009 "that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause." *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991). And it was generally established that a material and knowingly, or recklessly, false statement made by a government official—such as a federal agent, a state police officer, or a city investigator—to an innocent affiant, who then relies on that statement, can violate the Fourth Amendment. *See Kennedy*, 131 F.3d at 1376 (police officer failed to tell affiant about officer's shortcomings with respect to his training of a narcotics canine); *Wapnick*, 60 F.3d at 955 (city investigator provided allegedly false

27

statements to Internal Revenue Service agent); *DeLeon*, 979 F.2d at 763–64 (inspector was purportedly at-fault for affiant's failure to include in his affidavit a witness's full statement); *Calisto*, 838 F.2d at 712–13 (affiant included in his affidavit allegedly misleading information he learned from a Drug Enforcement Agency agent, who learned the information from a state crime commission officer, who learned the information from a city police officer, who learned the information from a confidential informant); *Pritchard*, 745 F.2d at 1118 (FBI special agent allegedly provided false information to affiant).

But Plaintiffs cite no authority—from the Supreme Court, our circuit, or any other circuit—demonstrating it was clearly established that such a statement made to an affiant by a private citizen volunteer, not employed or paid by any government entity, can serve as a basis for a *Franks* violation, even when the individual acted under color of state law for purposes of § 1983. Instead, the federal cases Plaintiffs cite to—*Kennedy, DeLeon*, *Wapnick*, *Calisto*, and *Pritchard*—all involved paid city employees with delineated investigatory roles. Accordingly, these cases do nothing to establish that a reasonable individual in Ms. Ferguson's or Dr. Norris's position on the Task Force, as a private citizen without law enforcement training or training regarding constitutional rights, would have recognized that he or she was violating Plaintiffs' constitutional rights by making knowingly and intentionally, or recklessly, false statements to Mr. Salas. And, within the context of qualified immunity, the burden falls squarely on the plaintiff to identify case law demonstrating that a defendant's conduct violated clearly established law such that a reasonable person in

28

the defendant's position would have known she was violating the plaintiff's rights. *Estate of Redd*, 848 F.3d at 906.

In an attempt to overcome the absence of case law establishing that a private citizen volunteer commits a constitutional violation by providing a false statement that is later innocently incorporated into a search warrant affidavit, Plaintiffs contend that a reasonable jury could find Ms. Ferguson and Dr. Norris were not merely citizen advisors but acted as law enforcement officers. Plaintiffs cite, among other things, evidence that Ms. Ferguson requested insignia that would show the "law enforcement" capacity of the Task Force members; that Ms. Ferguson was the Task Force's "coordinator"; and that Dr. Norris was the Task Force's "forensic veterinarian." They also cite evidence indicating that neither Mr. Salas nor Ms. Ferguson viewed Ms. Ferguson's role as merely advisory.

But Plaintiffs' argument that a jury could conclude that Ms. Ferguson and Dr. Norris were law enforcement officers runs contrary to language in Plaintiffs' complaint relative to Plaintiffs' supervisor liability claim against Mr. King and Mr. Suttle. Specifically, Plaintiffs alleged that "King and Suttle knew that Ferguson was not a peace officer, a law enforcement officer of any other sort, held no public office, and had had no training in law enforcement or the constitutional rights of citizens." App. at 24.

And, once again, Plaintiffs provide no federal authority for the proposition that private citizens—who are not employed or compensated by the state and who do not receive any law enforcement training or training on constitutional rights—can be

29

considered law enforcement officers. Indeed, our review of federal law has not yielded any authority treating a private citizen volunteer as a law enforcement officer for purposes of assessing a qualified immunity defense.

A review of New Mexico law, while not dispositive on the issue of who constitutes a law enforcement officer for purposes of a § 1983 qualified immunity analysis, further defeats Plaintiffs' argument that Ms. Ferguson and Dr. Norris were law enforcement officers.[9] New Mexico law defines "law enforcement officer" as:

> a full-time salaried public employee of a governmental entity . . . whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor.

N.M. Stat. Ann. § 41-4-3(D). New Mexico courts have viewed the question of whether a government official qualifies as a "law enforcement officer" as a matter of statutory interpretation; thus a question of law for a court to decide rather than a question of fact for a jury to decide. *See Abalos v. Bernalillo Cty. Dist. Attorney's Office*, 734 P.2d 794, 800 (N.M. Ct. App. 1987) (holding that, "as a matter of law," director of detention center qualified as "law enforcement officer"); *see also Rayos v. State ex rel. New Mexico Dep't of Corr., Adult Prob. & Parole Div.*, 336 P.3d 428,

---

[9] Although the "clearly established" prong of the qualified immunity analysis centers on the law as clearly established by federal courts, in the absence of a binding federal precedent on a matter central to the "clearly established" analysis, a court may consider relevant decisions of state courts. *Cf. Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004) ("[I]n the absence of binding precedent, we 'look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts . . . .").

431–36 (N.M. Ct. App. 2014) (concluding, for purposes of summary judgment, that probation and parole officer is not a "law enforcement officer").

In determining whether a given official qualifies as a "law enforcement officer," New Mexico courts compare the duties and job description of the individual at issue with the "traditional functions of law enforcement officers," relying on N.M. Stat. Ann. § 41-4-3(D) to place an emphasis on whether the individual spends a majority of his or her time "(1) making arrests for crimes, (2) holding in custody persons accused of criminal offenses, and (3) maintaining public order." *Rayos*, 336 P.3d at 432. The fact that an individual may have the power to perform the duties of a law enforcement officer will not render that individual a "law enforcement officer" if the individual's principal duties do not necessitate employment of any powers held by a traditional law enforcement officer. *See id.* at 432-33 (concluding probation and parole officer's power to make arrests did not render probation and parole officer "law enforcement officer" since making arrests was not a "principal duty"); *Dunn v. State ex rel. Taxation & Revenue Dep't*, 859 P.2d 469 (N.M. Ct. App. 1993) (holding that director of New Mexico Motor Vehicle Department was not a "law enforcement officer" even though he had power to make arrests). Similarly, the fact that an individual's primary duties may have a secondary or indirect effect on one of the emphasized traditional functions of a law enforcement officer will not render the individual a "law enforcement officer" where the individual's primary purpose is not one of the emphasized traditional functions of law enforcement. *See Rayos*, 336 P.3d at 434–35 (concluding that while probation and parole officers impact public safety

31

the primary purpose of their work is rehabilitation, which is not a traditional law enforcement function).

Here, neither Ms. Ferguson nor Dr. Norris qualifies as a "law enforcement officer" under New Mexico law. As members of the Task Force, Ms. Ferguson's and Dr. Norris's primary stated job functions were "engag[ing] in lobbying and other efforts aimed at the generation of new animal cruelty laws" and "facilitat[ing] information sharing between state and local law enforcement agencies regarding the implementation of new and existing animal cruelty laws," App. at 416. These job functions are not comparable to those of a traditional law enforcement officer as they have nothing to do with making arrests or holding persons in custody. And to the extent that Ms. Ferguson's and Dr. Norris's job functions may marginally impact maintaining public order, if the rehabilitation of probationers did not sufficiently impact the maintenance of public order to qualify a probation officer as a law enforcement officer, *see Rayos*, 336 P.2d at 434–45, it is hard to imagine how informing local agencies about animal cruelty laws sufficiently impacts the maintenance of public order so as to render Ms. Ferguson and Dr. Norris law enforcement officers. Likewise, New Mexico's highly-developed case law on who constitutes a "law enforcement officer" undoubtedly supports the conclusion that an animal cruelty task force coordinator and a forensic veterinarian would not qualify as "law enforcement officers." *See Dunn v. McFeeley*, 984 P.2d 760, 766–67 (N.M. Ct. App. 1999) (holding that medical investigator and crime laboratory technician are not "law enforcement officers"); *Abalos*, 734 P.2d at 800–01 (holding that district

32

attorney and staff at district attorney office do not qualify as "law enforcement officers"); *see also Tate v. Fish*, 347 F. Supp. 2d 1049, 1059–60 (D.N.M. 2004) (applying New Mexico law to conclude that animal control officer was not a "law enforcement officer."). Finally, Ms. Ferguson and Dr. Norris did not complete any law enforcement training similar to the law enforcement training that traditional law enforcement officers must complete under New Mexico law. *See* N.M. Stat. Ann. § 29-7-7.1.

The fact that neither Ms. Ferguson nor Dr. Norris qualify as a "law enforcement officer" under New Mexico law buttresses the conclusion that Plaintiffs have not sustained their burden of demonstrating that a reasonable individual in either Ms. Ferguson's or Dr. Norris's position would have understood that *Franks*— and the other cases cited by Plaintiffs featuring constitutional violations by law enforcement officers or investigators *employed* by the government—applied to them at the time they made allegedly false statements to Mr. Salas. *Cf. Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct 'the contours of a right are sufficiently clear' *that every 'reasonable official would have understood that what he is doing violates that right.'*" (emphasis added) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Accordingly, we affirm the district court's

grant of summary judgment on Plaintiffs' Fourth and Fourteenth Amendment claim against Ms. Ferguson and Dr. Norris.[10]

ii.  Fifth and Fourteenth Amendment Claim

Plaintiffs next contend Ms. Ferguson and Dr. Norris violated Plaintiffs' Fifth and Fourteenth Amendment right not to be deprived of their property without due process of law. Recall that the district court granted summary judgment on this claim in favor of Ms. Ferguson and Dr. Norris because no reasonable jury could find that Ms. Ferguson used knowingly false statements to coerce Reyes into consenting to the destruction of the roosters, hens, baby chickens, and eggs.

Under the Fifth and Fourteenth Amendments, the government may not deprive a person of his property without due process of law. U.S. Const. amend. V, XIV.[11] It is a fundamental principle of procedural due process that a state may not finally destroy a property interest without first giving the putative owner notice and an opportunity to be heard where he can present his claim of entitlement. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 433–34 (1982); *DiCesare v. Stuart*, 12 F.3d 973, 978 (10th Cir. 1993). "To set forth an actionable procedural due process

___

[10] Because we affirm the district court's grant of summary judgment on the ground that plaintiff failed to satisfy the "clearly established" prong of the qualified immunity analysis, it is not necessary for us to determine (1) whether the statements Plaintiffs identify in the warrant affidavit were false; (2) if the statements were false, Ms. Ferguson and Dr. Norris knew their statements were false or recklessly disregarded the truth when making the statements; or (3) whether probable cause supported the Second and Third Warrants absent inclusion of the allegedly false statements.

[11] "[T]he Fourteenth Amendment imposes a due process requirement on state officials." *Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007).

34

claim, a plaintiff must demonstrate: (1) the deprivation of a liberty or property interest and (2) that no due process of law was afforded." *Stears v. Sheridan Cty. Mem. Hosp. Bd. of Trustees*, 491 F.3d 1160, 1162 (10th Cir. 2007). "Property interests entitled to protection are created not by the Constitution, but rather by sources independent of it such as state law." *Stanko v. Maher*, 419 F.3d 1107, 1115 (10th Cir. 2005). The type of process required in a given case depends on three factors: (a) "the private interest that will be affected by the official action"; (b) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (c) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 1115–16 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Plaintiffs rely on the property interest in their roosters, hens, baby chickens, and eggs. Indeed, we have said "[t]he owner of cattle or other livestock clearly has a property interest protected by the Fifth and Fourteenth Amendments against its seizure and disposition." *Id.* at 1115; *see also White v. United States*, 67 F.2d 71, 79 (10th Cir. 1933) ("Personal property is any property other than real estate . . . , includ[ing] anything from chickens to air-ships."). Plaintiffs maintain that they were deprived of that property interest without due process of law. Specifically, they contend that although Mr. Salas obtained warrants to search Plaintiffs' property and to seize their birds, he failed to afford Plaintiffs notice and a hearing at which they could contest the seizure.

35

Plaintiffs make their notice-and-opportunity-to-be-heard argument for the first time on appeal. We usually deem issues raised for the first time on appeal forfeited. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011). "[W]e will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result." *Id.* To establish plain error, an appellant must show the existence of "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* But Plaintiffs do not argue—in their opening or reply brief—for plain-error review. A party's failure to "argue for plain error and its application on appeal . . . marks the end of the road for an argument" raised for the first time on appeal. *Id.* at 1131. Thus, we decline to consider Plaintiffs' theory that they were deprived of notice and an opportunity to be heard in violation of their Fifth and Fourteenth Amendment right to due process. Accordingly, we affirm the district court's grant of summary judgment on Plaintiffs' Fifth and Fourteenth Amendment claim against Ms. Ferguson and Dr. Norris.

b. *Mr. King and Mr. Suttle*

Plaintiffs also contest the district court's grant of summary judgment on their supervisory-liability claims against Mr. King and Mr. Suttle. "A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (internal quotation marks omitted). Supervisory liability "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which

36

subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Brown v. Montoya*, 662 F.3d 1152, 1163–64 (10th Cir. 2011) (internal quotation marks omitted). It is not enough for a plaintiff arguing for the imposition of supervisory liability to show that the supervisor had knowledge of his subordinate's conduct. *Gomez*, 745 F.3d at 435. Instead, the plaintiff must show "an 'affirmative link' between the supervisor and the constitutional violation." *Id.* (internal quotation marks omitted). To show the requisite affirmative link, a plaintiff must satisfy three elements: "(1) personal involvement; (2) causation; and (3) state of mind." *Id.* (internal quotation marks omitted).

When a § 1983 plaintiff pursues a claim of supervisory liability, he must show the subordinate violated his constitutional rights—a supervisor cannot be liable if the subordinate did not commit a violation. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) (stating that the causation element of the affirmative-link test requires a plaintiff to show "that the defendant's alleged action(s) caused the constitutional violation" committed by a subordinate, suggesting that an underlying constitutional violation is required); *see also Dodds v. Richardson*, 614 F.3d 1185, 1209 (10th Cir. 2010) (Tymkovich, J., concurring) ("Whether a supervisor has violated the plaintiff's rights is dependent on whether the subordinate violated the Constitution[.]"). Having concluded that Plaintiffs have not successfully advanced their Fifth and Fourteenth Amendment claim against Ms. Ferguson or Dr. Norris, Plaintiffs' attempt to hold Mr. King and Mr. Suttle liable for any purported violation must fail.

Moreover, when a supervisor seeks qualified immunity in a §1983 action, the clearly established prong is met only when the supervisor's and the subordinate's actions violate clearly established law. *See Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992); *see also Grice v. McVeigh*, 873 F.3d 162, 169 (2d Cir. 2017) ("Defendants are entitled to qualified immunity on a supervisory liability claim [under § 1983] unless the actions of the supervisor *and* the subordinate both violate clearly established law."); *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998) (same); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 (5th Cir. 1994) (same). As stated, Plaintiffs fail to show Ms. Ferguson or Dr. Norris violated clearly established law for their Fourth and Fourteenth Amendment claim. Thus, we conclude that Mr. King and Mr. Suttle are entitled to qualified immunity on Plaintiffs' supervisory-liability claim arising out of that alleged violation.

We affirm the district court's grant of summary judgment in favor of Mr. King and Mr. Suttle.

### III.    CONCLUSION

We AFFIRM the district court's decision to strike the transcript of Mr. Current's interview. We also AFFIRM the district court's grant of summary judgment to Ms. Ferguson, Dr. Norris, Mr. King, and Mr. Suttle on qualified immunity grounds.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

38